**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| **KIMBERLY A. PORTER,** | **CASE NO. 1:16-CV-00978** |
| **Plaintiff,** | **Judge William O. Bertelsman** |
| | **Magistrate Judge Stephanie K. Bowman** |
| **v.** | |
| **TRIHEALTH, INC.,** | **PLAINTIFF'S MEMORANDUM IN** |
| | **OPPOSITION TO DEFENDANT'S** |
| **Defendant.** | **MOTION FOR SUMMARY** |
| | **JUDGMENT** |

### I.      INTRODUCTION

This case involves perhaps the most straightforward violation of the ADA this Court is likely to see. The evidence shows that Plaintiff Kim Porter, though afflicted with lupus, was able to perform all the essential functions of her job – a job she liked, was good at, and wanted to keep. All she needed from her employer was a simple accommodation to a non-essential job function. Specifically, Plaintiff requested a slightly modified work schedule – one that not only caused no hardship to her employer, **but also had been routinely granted, in various forms, to other employees in her department who were not disabled**.

Defendant, however, refused to discuss any accommodation that would allow Plaintiff to keep her job. It completely ignored its obligation to engage with its disabled employee in the "interactive process" mandated by the ADA, and it made no effort to arrive at a reasonable accommodation of her disability.

In so acting, Defendant completely frustrated the main purpose of the ADA, *which is to help disabled people like Plaintiff remain productively employed – rather than dependent on government assistance – by requiring employers to take reasonable, affirmative measures to accommodate them.*

Defendant's action also discriminated against Plaintiff on the basis of her race (African American), and because of her federally protected usage of FMLA leave, as she was treated much less favorably than similarly situated employees who were Caucasian, and/or who had not used FMLA leave.

Lastly, Defendant violated the FMLA by blatantly interfering with Plaintiff's exercise of her right to take intermittent medical leave for her serious health condition – choosing to fire her rather than grant the leave she requested and needed.

The Equal Employment Opportunity Commission has already determined that Defendant violated Plaintiff's rights under the ADA – a determination the Commission makes in only a tiny percentage of the Charges filed with it. (See Complaint and Answer, par. 38.) The evidence now in the record is fully supportive of that determination, and mandates that this case proceed to trial. Defendant's Motion reaches a contrary conclusion only by cherry-picking the facts, failing to construe the evidence in Plaintiff's favor (as Rule 56 requires), and misreading the applicable law.

## II.   STATEMENT OF FACTS

At the time of the events giving rise to this case, Plaintiff was one of four "regular" sonographers working for Defendant at Good Samaritan Hospital. The other three regular sonographers were Justice Daniels, Rachel Schill, and Jackie Bauer. Mr. Daniels is a native of Africa who has lived in the United States since 1991. Ms. Schill and Ms. Bauer are Caucasian, as was the department's supervisor, Dawn Patten. Ms. Patten is the individual primarily responsible for the decisions that caused Plaintiff to lose her job.

In addition to its "regular" sonographers, the hospital employs "optional" or "OPT" sonographers. These employees work "p.r.n.," or "as needed." Defendant has had two "optional" positions at Good Samaritan Hospital for much of the relevant time period, and still does today.

2

(Schill dep., pp. 12, 20; Korblick dep. pp. 10-11; Polking dep., p. 10.) For the last year of Plaintiff's employment, the hospital's two optional sonographers were Lauren Polking and Laura Korblick.

The regular hours of the hospital's ultrasound department are Monday through Friday, 7:00 AM to 5:00 PM, and on Saturdays from 8:00 AM to noon. When the department is not open, there is a sonographer "on-call." The on-call sonographer must be able to get to the hospital within an hour of being contacted, but otherwise is free to do as he or she wishes while "on-call." (Bauer dep., p. 9.) It is relatively rare for the on-call sonographer to actually be called into work between the hours of 9:00 PM and 6:00 AM. (Porter Declaration, attached, pars. 3-6.)

Though on-call responsibilities at the hospital have at times been "rotated" among the sonographers, it is the *responsibility* that has been rotated – not the actual on-call hours themselves. In other words, no sonographer has ever been required actually to **be** on call – even for an hour or a minute. (Daniels dep., p. 22.) Sonographers have always been permitted to give up their call responsibility to coworkers willing to take it, and this is a commonplace occurrence. (Daniels dep., p. 22; Polking dep., p. 31; Schill dep., p. 22.) Thus, the on-call "schedule" or "rotation" has always been extremely flexible. And – as will be seen below – while some sonographers take lots of on-call hours, others will for long stretches take none at all.

Many sonographers are willing – some even eager – to take additional "on-call" hours from their coworkers as a way to earn extra income. (Schill dep., p.26; Bauer dep., p. 16; Korblick dep., pp. 11, 22, 40-41; Daniels dep., pp. 17-18, 23.) They earn three dollars an hour for all the time they are "on call" – even if they are never called in to work. They also earn a minimum of three hours full pay whenever they are actually called in. Even if they work for 10 minutes, for example, they still are paid at their regular rate for three full hours. (Korblick dep., p. 18.)

3

It is therefore not surprising that sonographers have always been able to find someone to take their call when they want to give it up. No one has ever been "forced" to take call, other than in an emergency. (Daniels dep., p. 28; Schill dep., pp. 22-23.) When a sonographer has needed (or just <u>wanted</u>) to relinquish on-call hours, they have **always** been permitted to do so, and have always found takers. (Daniels dep., pp. 15-16, 28; Polking dep., p. 31; Schill dep., p. 22.) Supervisor Patten explicitly told the sonographers, in November of 2014, that they were free to – in her words – "**ditch their call**" in favor of another sonographer. (Patten dep., pp. 49-50 and Ex. 8.)

As noted above, Good Samaritan Hospital typically employs at least two "optional" or "p.r.n." sonographers. These employees only work "as needed," and only get paid when they work. Consequently, they seek out opportunities to take as many on-call hours as they can find. There was a period of approximately a full year – stretching over 2013 and 2014 – when optional sonographer Lauren Polking was literally taking **all** on-call hours for the entire department. (Polking dep., p. 14.) Optional sonographer Laura Korblick likewise sought out all the on-call hours she could find. (Korblick dep., pp. 11, 22, 40-41.) Thus, the "regular" sonographers – Plaintiff, Schill, Bauer, and Daniels – went exceptionally long periods of time without taking any on-call hours at all. No regular sonographer took <u>any</u> call for a **full year** when Lauren Polking was taking it all. And Rachel Schill once went a four-month period during which she was "on-call" for exactly <u>one</u> shift. (Patten dep., pp. 106-107.)

In sum, the evidence shows that what Defendant calls an "essential" job function – being on-call – is actually something regular sonographers go long periods without having to do at all**.** It is also something they have always been permitted to relinquish to other sonographers.

One employee who relinquished a particularly large portion of her on-call responsibility was a Caucasian sonographer, previously identified, named Rachel Schill. Unlike Plaintiff (who

only asked for a slightly modified call schedule because of a physical disability), Ms. Schill's relinquishment of her on-call hours – often <u>all</u> of her on-call hours – resulted simply from the fact that she didn't *like* being on call. Ms. Patten freely allowed Ms. Schill to "ditch her call" to other willing sonographers with no questions asked. (Daniels dep., pp. 21-22; Porter dep., pp. 26-28 and Ex. 6; Schill dep., p. 55; Bauer dep., pp. 32-33.) In Plaintiff's case, however, and as elucidated below, Patten refused to consider an accommodation that actually would have had her "on call" more than any other sonographer.

Defendant had a written job description for the sonographer position. This job description did <u>not</u> indicate that being "on call" was in any way a function or responsibility – essential or otherwise – of the position Plaintiff held. (Hall dep., Ex. 2; Patten dep., p. 68.) Ms. Patten tried to <u>add</u> this to the job description – **after the fact** – when Plaintiff made her request for an accommodation of her disability. (Porter dep., p. 74; Hall dep., p. 32.)

In 2013, Plaintiff was diagnosed with lupus. As a result, she needed to take FMLA leave for a period of consecutive weeks. After her initial leave, Plaintiff would experience flare-ups in her condition, as a result of which she would need to take leave for short periods on an intermittent basis. In 2014, her physician's FMLA certifications stated she should not be on call between 9:00 PM and 6:00 AM, in order to reduce her flare-ups. (Porter dep., Exhibits 7, 20.)

Ms. Patten was clearly irritated by Plaintiff's exercise of her right to take FMLA leave. She initially tried to reduce Plaintiff's PTO bank because of her inability to take call during overnight hours – *even though other sonographers who had given up some or all of their call hours had not lost any PTO because of it*. (Porter dep., p. 37 and Ex. 9.) When Plaintiff interviewed for another position within TriHealth, Ms. Patten told the interviewer she had a problem with Plaintiff's "attendance." (Fender dep., Ex. 4.) Since Plaintiff did not have any issues with her attendance

*other than time she missed under the FMLA*, Ms. Patten's criticism of her attendance was clearly a negative reference to her use of federally-protected leave. (Porter Decl., par. 13.)

There is further evidence of Ms. Patten's antipathy toward Plaintiff's use of FMLA leave. She told sonographer Jackie Bauer in 2015 (shortly before Plaintiff was let go) that Plaintiff would not be employed much longer because of how much she had been "calling in sick." (Daniels dep., pp. 35-41.) This despite the fact that Plaintiff had never abused her FMLA rights, or exceeded the amount of leave she was entitled to take. (Porter Decl., par. 12.)

When Plaintiff's doctor restricted her (in 2014) from being on-call between 9:00 PM and 6:00 AM, Plaintiff offered to take **all** the on-call hours until 9:00 PM, including weekends. She began taking call from 5:00 PM to 9:00 PM every Tuesday through Friday, noon to 9:00 PM every Saturday, and 6:00 AM to 9:00 PM every Sunday. (Polking dep., p. 30; Patten dep., Exs.7-8.)

None of the sonographers in Plaintiff's department complained about this schedule. (Porter dep., Ex. 17; Korblick dep., pp. 13-14, 42-43; Daniels dep., p. 26; Polking dep., p. 25; Bauer dep., p. 24.) The truth of the matter is they **liked and embraced it**. It completely excused them from being on call during the early evening hours on weekdays, and during the daytime on weekends – i.e. their most valuable "family time." (Korblick Declaration, attached, pars. 3-4; Daniels dep., pp. 25-26; Polking dep., pp. 24-25.)

It is important to note that this modified call schedule – which Plaintiff would later propose to Defendant in an unsuccessful attempt to get it to engage with her in the interactive process – did **not** mean Plaintiff was unable or unwilling to be on call, or that she could not take "her fair share" of the on-call responsibilities. In fact, Plaintiff under this schedule had **more on-call hours than any of the other sonographers**. (Patten dep., p. 49; Porter Decl., par. 8.) And since most "calls"

came to the on-call sonographer <u>before</u> 9:00 PM, this modified schedule also meant that Plaintiff was actually called in to work, while on-call, more than anyone else. (Porter Decl., pars. 5-6.)

This schedule worked well for all the sonographers for a year. In July 2015, however, Ms. Patten sent Plaintiff to "meet with HR." She said one of the optional sonographers, Laura Korblick, had found a regular job at Bethesda Butler County Hospital, and that this meant Ms. Korblick could no longer "cover" (in Patten's words) Plaintiff's call. (Porter dep., pp. 69-70.)

Ms. Patten's statement to Plaintiff was not true. As described above, neither Ms. Korblick nor anyone else had been "covering" Plaintiff's call. The truth is that a modified call schedule had been in place for a year, under which – among other things – Plaintiff had been taking <u>more</u> on-call hours than anyone else. Ms. Korblick had not been "covering" Plaintiff's call, any more than Plaintiff had been "covering" the call of the other sonographers up to 9:00 PM.

Furthermore, the record shows Ms. Korblick's new position at the Butler County facility did <u>not</u> mean she was no longer available to take call at Good Samaritan. (Korblick dep., p. 28.) She <u>told</u> Ms. Patten, in fact, that she was still available to be on call. (Id, 40-41.) She would <u>remain</u> available to take call at Good Sam, in fact, for another two years. (Id., p. 42.)

As directed by Ms. Patten, however, Plaintiff met with HR – in the person of Jacqueline Hill. Ms. Hill "explained what the ADA was," and gave Plaintiff some forms for her and her physician to complete about her lupus, and about her ability to perform the functions of her job. (Porter dep., pp. 70-72.) Plaintiff returned the completed paperwork, which included her doctor's statement and a request for an accommodation under the ADA. (Id., Ex. 25.)

Specifically, Plaintiff suggested that she be on-call every Tuesday through Friday from 5:00 PM to 9:00 PM, every Saturday from noon to 9:00 PM, and every Sunday from 6:00 AM to 9:00 PM. (Id., p. 2.) She pointed out that this proposed schedule, though not requiring her to take

call after 9:00 PM, would require her to be on call more than any other sonographer. (Id.) It also would have relieved her coworkers from <u>any</u> on-call responsibilities on weekend days, and on four out of five weekday evenings – i.e. the best "family time" for most people.

After Plaintiff turned in her request, Ms. Hill gave Ms. Patten a form called "Supervisor's Response to Employee's Request for Accommodation." (Hill dep., Ex. 7.) Ms. Patten was instructed that, "A reasonable accommodation may include… allowing part-time or modified work schedules." Ms. Patten was also told the following, which was underlined in the instructions:

> <u>In considering the employee's request, it is important to include the employee in the process, to understand the restrictions and/or limitations and investigate alternatives if the request is unduly burdensome</u>. [Id.]

In responding, Ms. Patten – who, as detailed above, had been hostile to Plaintiff's FMLA usage from the beginning – made multiple statements to Ms. Hill that she knew to be false. She falsely stated that the modified schedule Plaintiff had proposed (and which had been in place previously) would cause "employee dissatisfaction," when in fact this same schedule had been widely <u>appreciated</u> by Plaintiff's colleagues. (Id., p. 3, and see p. 6, supra.)

Ms. Patten also falsely claimed that "an employee [Laura Korblick] was hired OPT [by Good Sam] specifically to cover Kim's responsibilities for call." (Id., p. 3.) The truth (as Ms. Patten knew) was that Ms. Korblick had been hired by Good Sam (in late 2014) because <u>another</u> optional sonographer – Lauren Polking – had at that time been hired to work full time at Children's Hospital. (Korblick dep., p.10.) Given that Ms. Polking had been an optional at Good Sam long <u>before</u> Plaintiff had ever needed an accommodation. Ms. Korblick obviously was not "hired to cover Kim's responsibilities for call," as Ms. Patten falsely stated. Ms. Korblick was hired simply because **Ms. Polking's** situation had changed (though Ms. Polking herself continued to take call at Good Sam after being hired at Children's).

8

Ms. Patten went on to claim to Ms. Hill that the hospital could not provide the accommodation Plaintiff had requested. ((Hill dep., Ex. 7, p. 4.) When asked if she considered any other potential accommodations for the employee, she said no. (Id., p. 5.)

Ms. Hill accepted without question, and without investigation, Ms. Patten's assertion that Plaintiff's requested accommodation was "unreasonable." Nor did Hill investigate Patten's blanket assertion that no other accommodations were even worth considering. Though Plaintiff told Ms. Hill that some sonographers did not actually take call, Ms. Hill did not look into this. (Hill dep., p. 35). And Ms. Hill was not aware – when accepting Patten's assertion that taking call was an "essential function" – that several of Plaintiff's colleagues had gone as long as a full year without taking any call at all. (Id., p. 38.) Nor did Ms. Hill realize that Plaintiff's proposed accommodation would have had her taking more on-call hours than anyone in the department. (Id., p. 38.)

Contrary to Ms. Hill's explicit statement – in the form she gave to Ms. Patten – that "*it is important to include the employee in the process*, to understand the restrictions and/or limitations *and investigate alternatives*," the record shows Defendant engaged in no "interactive process" with Plaintiff at all. There was **no** discussion, **no** interaction, **no** "back and forth" with her about her accommodation request. (Porter Decl., pars. 7-11.) Ms. Hill did not explore, or make any independent assessment of, Ms. Patten's claim that Plaintiff's request was unreasonable. (Hill dep., p. 45.) She had no discussions with Plaintiff (or any of her coworkers) about the reasonableness or workability of a modified call schedule (Hill dep., pp. 28, 39-40), and she gave no consideration to any other possible accommodations that would have allowed Plaintiff to remain in her job. (Id., p. 58.) She simply told Plaintiff, "We've accommodated you long enough," and said she was being removed from her position. (Porter dep., pp. 72-73.)

As noted above (pp. 3-5), the practice in the department had always been to allow sonographers to give up their call as long as they could find someone to take it. There were at least three sonographers – Daniels, Polking, and Korblick – who were quite willing to take what Ms. Patten was inaccurately calling "Plaintiff's" overnight call hours, under the modified schedule Plaintiff proposed. (Daniels dep., p. 29; Korblick dep., p. 53; Patten dep., p. 114.) And even Ms. Patten was forced to admit – in light of her statements that sonographers could "ditch their call" if they found takers – that there was no reason Plaintiff could not have kept her job if others were available to cover the overnight call, which the record shows they were. (Patten dep., p. 71.)

Defendant, however, would not even allow <u>discussion</u> about this, or about any other possible accommodations – such as using agencies to cover part of the call responsibility, as TriHealth did in other ultrasound departments. (Porter Decl., par. 11.) Defendant never got to the point of **finding out** if any accommodations for Plaintiff were possible or reasonable, b**ecause it completely cut off and short-circuited the interactive process**. (Id., pars. 7-11) It just flatly rejected Plaintiff's proposed accommodation, did not consider or explore <u>any</u> alternatives, and had no interaction with Plaintiff that might have led to a solution easily within their grasp.

Because of Defendant's outright refusal to engage in the interactive process, a disabled employee who was *able* to work, who was *able* to contribute, and who had been a *taxpayer* – i.e. all the things the ADA was designed to *promote* – was now thrown out of work, and forced onto public assistance. (Porter dep., p. 84.)

Upon learning that Defendant was terminating Plaintiff – an experienced sonographer who been working not only her regular shifts but also more on-call hours than anyone else – her coworker Rachel Schill was heard to say, "How dumb can [TriHealth] be?" (Polking dep., p. 28.)

### III.   <u>ARGUMENT</u>

10

A. **DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S ADA CLAIMS.**

1. **The ADA does more than prohibit discrimination. It requires employers to actively assist and accommodate disabled employees, to help them secure and maintain employment.**

At the outset, it must be remembered that the ADA is unique among federal anti-discrimination laws. Unlike the 1964 Civil Rights Act and the ADEA, for instance, which simply require that all persons be treated equally, the ADA requires that, in some circumstances, covered employers must actually take affirmative steps to <u>help</u> disabled people obtain or keep employment.

It is not enough, in other words, for an employer to treat the disabled "just like everyone else." An employer may have to <u>change</u> certain things to ensure that the disabled have equal access to employment opportunities. See e.g. Erickson v. Bd. of Governors, 207 F.3d 945, 949 (7th Cir. 2000) ("[T]he ADA, by contrast, requires employers to consider and to accommodate disabilities, and in the process extends beyond the anti-discrimination principle"); Riel v. Electronic Data Systems, 99 F.3d 678, 681 (5th Cir. 1996) ("The ADA mandate that employers must accommodate sets it apart from most other anti-discrimination legislation . . . [A]n employer who treats a disabled employee the same as a non-disabled employee may violate the ADA").

Accordingly, the forms of discrimination prohibited by the ADA include the failure to provide reasonable accommodation to an "otherwise qualified" individual with a disability, unless doing so would impose an undue hardship on the employer. Id, § 12112(b)(5). An individual is "otherwise qualified" if he or she can perform the "essential functions" of the job, with or without a reasonable accommodation. Id, § 12111(8).

2. **Being on call during overnight hours was not an "essential function" of the position of sonographer at Good Samaritan Hospital.**

Defendant's argument in support of summary judgment on Plaintiff's ADA claim hinges underlie on its assertion that "the on-call responsibility is an essential function of the sonographer position at Good Samaritan Hospital." (Motion, p. 6.)

To begin with, Defendant's very description of the issue is misleading, because **Plaintiff never proposed or asked that she be excused from "the on-call responsibility."** As already noted several times, Plaintiff suggested a modified on-call schedule – one that would actually have given her more on-call responsibility than any of her colleagues.

The question before the Court in this case, therefore, is not the vague one posed by Defendant – i.e. whether a generic, undefined "on-call responsibility" existed for sonographers. It is rather whether an essential function of the sonographer job at Good Sam was **to be on call during overnight hours**. The answer to that question is an obvious "no." More importantly for purposes of Defendant's Motion, and as set forth below, *the Sixth Circuit has made clear that this is a question of fact* – one that ordinarily must be entrusted to the jury to determine.

Where, as here, there is a dispute as to whether a certain job criterion is an "essential function" of a position, the underline employer has the burden of proving that it is. Defendant, therefore, has the burden of proving that being on call between the hours of 9:00 PM and 6:00 AM was an "essential function" of Plaintiff's job:

> The employer will bear the burden of proving that a challenged job criterion is essential. [Kleiber v. Honda of America, Inc., 485 F.3d 862, 868-869 (6th Cir. 2007) (quoting Hedrick v. Western Reserve Care Systems, 355 F.3d 444, 452 (6th Cir. 2004))]

Moreover, a dispute about whether something is an "essential function" of a job is usually a factual question to be resolved at trial. The Sixth Circuit regards this as an issue not ordinarily appropriate for resolution on a dispositive motion:

> Whether a job function is essential is a question of fact that is

typically not suitable for resolution on a motion for summary judgment. [Keith v. County of Oakland, 703 F.3d 918, 926 (6th Cir. 2013) (citing Kiphart v. Saturn Corp., 251 F.3d 573, 585 (6th Cir. 2001))]

A reasonable fact-finder could certainly conclude from the evidence in the record here that having an on-call responsibility during overnight hours was in no way an "essential function" of the job of sonographer at Good Sam. As outlined below, there is no reason for the Court to ignore the general rule in this Circuit that the jury should decide this question.

A function may be considered essential because (1) "the reason a position exists is to perform that function," (2) there are a "limited number of employees available among whom the performance of that job function can be distributed," and/or (3) the function is "highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function." 29 CFR 1630.2(n)(2). A job function is considered essential if its removal would "fundamentally alter" the position. Kiphart v. Saturn Corp., 251 F.3d 573, 584 (6th Cir. 2001) (quoting 29 C.F.R. § 1630.2(n)).

Courts consider the following factors in making this determination: (i) The employer's judgment as to which functions are essential; (ii) Written job descriptions prepared before advertising or interviewing applicants for the job; (iii) The amount of time spent on the job performing the function; (iv) The consequences of not requiring the incumbent to perform the function; (v) The terms of a collective bargaining agreement; (vi) The work experience of past incumbents in the job; and (vii) The current work experience of incumbents in similar jobs. Hoskins v. Oakland County Sheriff's Dep't, 227 F.3d 719, 726 (6th Cir. 2000).

It is very telling that Defendant's Motion cites only one of these seven factors – the employer's judgment as to what functions are essential – as favoring its position on this issue. Defendant does not even attempt to argue that any of the other six factors are in its favor. It is easy

13

to understand why, as the other six factors plainly point to the opposite conclusion.

To begin with, and as already noted, Defendant's job description for the position of sonographer does not state that any on-call responsibility is an essential function of the job. Next, the amount of time spent performing the "on-call function" – if this can even be called a "function" – is minimal at best. (Porter Decl., pars 3-6.) Further, the "consequences of not requiring the incumbent to perform the function" are non-existent, as others (particularly the optional sonographers) are quite willing to take additional overnight call responsibility, and are financially incentivized to maximize their on-call hours.

Lastly, the experience of both past and current employees in this and similar jobs shows unmistakably that taking call – whether in general, or during overnight hours in particular – is not essential to doing the job of a sonographer. The record shows that sonographers at Good Sam have recently gone extraordinarily long periods – as long as a full year – without taking any call at all. And sonographers in other TriHealth ultrasound departments never have to take call, as agencies are used for that purpose. (Porter Decl., par. 11.)

Defendant is even wrong about the only factor of the seven it claims to be in its favor – the "employer's judgment" factor. Defendant relies here exclusively on the self-serving opinion of Ms. Patten – who was the motivating force behind Plaintiff's dismissal – that taking call was, in her view, an essential function. But the evidence shows that even Ms. Patten did not really regard taking call – overnight or otherwise – as an essential function of the position of sonographer. Indeed, how can it reasonably be said that Ms. Patten regarded taking call as an essential function when she openly invited all the sonographers to "ditch their call" when it suited them? *And can anything be accurately called an "essential" job function when many of the employees occupying*

14

*the job have recently gone a **full year** without having to do it a **single** time?* [1]

> **3.     The jury could reasonably conclude that Defendant failed to engage in the interactive process, that the process broke down because of Defendant's failure to engage in it, and that Plaintiff lost her employment because of Defendant's failure.**

Under the ADA, covered employers <u>must</u> provide reasonable accommodation for disabled

employees and applicants, unless to do so would cause an undue hardship:

> A covered entity is <u>required</u>, absent undue hardship, to provide a reasonable accommodation to an otherwise qualified individual who meets the definition of disability.  [29 CFR 1630.2(o)(4) (emphasis added)]

In order to arrive at an acceptable accommodation, the employer may have to start a

dialogue with the disabled employee:

> To determine the appropriate reasonable accommodation, it may be necessary for the covered entity to initiate an informal, interactive process with the individual.  [<u>Id</u>, 1630.2(o)(3)]

The employer's duty to engage in this interactive process "is mandatory, and 'requires

communication and good faith exploration of possible accommodations.'"  <u>Keith v. County of</u>

<u>Oakland</u>, 703 F.3d 918, 929 (6th Cir. 2013), citing <u>Kleiber v. Honda of Am. Mfg.</u>, 485 F.3d 862,

871 (6th Cir. 2007).

Here, the record shows that Plaintiff <u>tried</u> to initiate an interactive process about ways she

_____

[1] Defendant relies heavily on a district court case out of Minnesota, Meyer-Gad v. Centra Care Health Sys., 2006 U.S. Dist. LEXIS 76327 (D. Minn. 2006). There are at least three vital distinctions between Meyer-Gad and the case at bar: (1) the defendant there did <u>not</u> - unlike Defendant here - routinely permit employees to give up their on-call hours; (2) unlike Plaintiff and her coworkers here, none of the employees in Meyer-Gad had gone as long as a full year without <u>once</u> having to be on call; and (3) unlike Ms. Patten here, the supervisor in Meyer-Gad had <u>not</u> explicitly told employees that they could "ditch their call" when it suited them.
      By contrast, three **other** district court cases have found – in circumstances much closer to those present here – that there is an issue of fact as to whether being on call is an "essential function" of a job, **and that the employer is <u>not</u> entitled to summary judgment on that issue**. Henningsen v. City of Blue Earth, 184 F. Supp. 3d 710 (D. Minn. 2016; Mueller v. Rutland Mental Health Servs., 2006 U.S. Dist. LEXIS 58004 (D. Vermont 2006); Davis v. Ozarks Elec. Coop., 2006 U.S. Dist. LEXIS 21835 (W.D. Ark. 2006).

could stay in her job as a sonographer at Good Samaritan Hospital. She proposed an accommodation that would have had her "on-call" more than any other sonographer, and that would have given her coworkers their evenings and weekends free – something they highly valued.

For its part, however, Defendant not only rejected Plaintiff's proposed accommodation, *but refused even to engage with her* – completely ignoring the mandatory duty imposed by the ADA to participate in the interactive process. Defendant literally made no effort whatsoever to try to find a reasonable solution that would have allowed Plaintiff to remain in her job.

The record also shows, moreover, that there were multiple reasonable accommodations available, if only Defendant had been willing to look at them. Being on-call is financially rewarding to the sonographers – particularly to the optional sonographers, who only get paid when they work – and a modified call schedule along the lines Plaintiff was suggesting had already been embraced by the other sonographers in Plaintiff's department. Many sonographers – including especially Rachel Schill – had never encountered any problems giving up their on-call hours, and Plaintiff was suggesting a schedule that would have had her taking more than anyone else.

There were other reasonable outcomes in view as well. These included using an agency to take some limited overnight call. Other ultrasound departments within TriHealth used this method to handle all their on-call duties. (Porter Decl., par. 11.) It also may have been possible for Plaintiff to seek her physician's permission to take overnight call on those occasions – likely to be very rare – when a coworker was not able and willing to do so. **It must be remembered that Defendant's former "rotation" gave on-call responsibilities to each sonographer only one night a week and every fifth weekend**. Thus, it was a minor responsibility to begin with, and not difficult to accommodate if Defendant had simply been willing to engage – in good faith – in the interactive process mandated by the ADA.

But the parties here never even <u>had</u> any of these discussions. They never even <u>explored</u> these possibilities. And the <u>reason</u> they did not do so is that Defendant did not <u>allow</u> it. Defendant – in violation of both the ADA and its own policy – never engaged with Plaintiff, never interacted with her, and never had a dialogue with her. It simply rejected <u>her</u> proposed accommodation out of hand, did not propose <u>any</u> alternatives of its own, and told Plaintiff that if she did not find another job she would be terminated.

Where an employer refuses to engage in the interactive process, and a disabled employee loses her job as a result, the employer has violated the ADA and is liable for the consequences:

> When a party obstructs the [interactive] process, or otherwise fails to participate in good faith, courts should attempt to isolate the cause of the breakdown and then assign responsibility.  [Kleiber, *supra*, 485 F.3d at 871]

The responsibility for the "breakdown" that occurred here lies with Defendant. The jury should be permitted to hear the evidence supporting this conclusion, and assign liability accordingly.

### B.  <u>DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S FMLA CLAIMS.</u>

Plaintiff's Complaint asserts claims for both interference and retaliation under the FMLA. Both claims present triable issues of fact for the jury.

First, Defendant interfered with Plaintiff's attempted use of FMLA leave by refusing to give her time off needed for a serious health condition, and terminating her employment because of the time she needed off.

In the FMLA certification provided by Plaintiff's doctor (Porter dep., Ex. 23), it was recommended that she be off work between the hours of 9:00 PM and 6:00 AM in order to reduce the flareups caused by her lupus. *In other words, Plaintiff needed medical leave, intermittently, for those (rare) occasions when she would otherwise be called into work during those overnight hours*. Plaintiff was entitled to take that medical leave without interference from Defendant.

Defendant, however, fired Plaintiff instead of granting her the requested leave.

Plaintiff's FMLA interference claim is very similar to the claim upheld by the Sixth Circuit in Verhoff v. Time Warner Cable, Inc., 299 Fed. Appx. 488 (2008) – a case Defendant anticipatorily tries to distinguish in its Motion. The plaintiff in Verhoff had received a note from his physician stating that he could not work more than 40 hours in a week, due to a serious health condition. In response, his employer terminated his employment – just as Defendant here terminated Plaintiff's employment in response to her physician's statement that she should not be on-call between 9:00 PM and 6:00 AM. Verhoff's employer claimed that working more than full time was an essential function of the job because employees had to be able to work "standby hours" in addition to their regular shifts – just as Defendant here claims its employees had to be able to work "on-call hours" in addition to <u>their</u> regular shifts.

The Sixth Circuit upheld the District Court's grant of summary judgment to the plaintiff on his FMLA interference claim. Of critical importance to the instant case is the Court's holding that working more than 40 hours a week can **never** be an "essential function" of a job for purposes of the FMLA:

> And because the FMLA expressly contemplates that employees who are otherwise capable are entitled to work their jobs either "intermittently or on a reduced leave schedule" when "medically necessary," 29 U.S.C. § 2612(b)(1), **working more than full-time cannot logically be an essential part of one's job under the FMLA.** [Verhoff v. Time Warner Cable, Inc., 299 Fed. Appx. 488, 497, 2008 U.S. App. LEXIS 22488, *22-23 (6th Cir.) (emphasis added)]

If working "more than full-time" cannot be an essential function of a job for purposes of the FMLA, it would be nonsensical to hold that being "on call" – *in addition to working one's regular shifts* – somehow <u>can</u> be an "essential function" under the FMLA. Some of Defendant's sonographers work full time, as did Plaintiff for part of her employment. If employees cannot work

18

*additional* hours (beyond their regular shifts) because of a serious health condition, the FMLA requires that they be granted unpaid medical leave during those additional hours.

Plaintiff's case here is even more compelling than was Verhoff's, as Plaintiff here was able to work – and was offering to <u>continue</u> to work – many on-call hours in addition to her regular shifts. She was entitled to take FMLA leave, however, with respect to those <u>limited</u> hours that her doctor said she should not work, as long as she could continue to work her regular shifts.

Plaintiff's FMLA retaliation claim must likewise go to trial. There is substantial evidence that Ms. Patten held a retaliatory bias against Plaintiff because of her use of federally protected leave, and this bias was evident when Patten moved to terminate her in 2015 due to her need for time off. Ms. Patten had attempted to retaliate against Plaintiff because of her FMLA status once before, by trying to take away her PTO hours. (See p. 6, supra). She also refused to allow Plaintiff to find coverage for her on-call hours when the need for said coverage was necessitated by her serious health condition – *despite having <u>routinely</u> allowed other employees to find coverage for <u>their</u> on-call hours for any reason whatsoever*. (See pp. 4-5, 10, supra.) Ms. Patten also gave Plaintiff a negative reference because of her "attendance" – clearly referring to her FMLA usage – and told one of Plaintiff's coworkers near the end of her employment that she would not be there much longer because of how much she had been "calling in sick." (See p. 6, supra.)

Employers are not permitted to hold the use of FMLA leave against an employee, or consider it as a "negative factor" in making employment decisions. 29 C.F.R. §825.220(c)]. "If an employer takes an employment action based, **in whole or in part**, on the fact that the employee took FMLA-protected leave, the employer has denied the employee a benefit to which he is entitled." Wysong v. Dow Chemical Co., 503 F.3d 441, 447 (6th Cir. 2007) (emphasis added).

There is more than sufficient evidence in the record here to support a finding that Ms.

Patten held Plaintiff's FMLA usage against her, and that this bias caused Plaintiff's termination.

### C.   <u>DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S RACE DISCRIMINATION CLAIM.</u>

Plaintiff was terminated at the instigation of Ms. Patten – her Caucasian supervisor – because there were (very limited) on-call hours she was unable to cover due to her disability. By contrast, Ms. Patten permitted Plaintiff's Caucasian coworker – Rachel Schill – to relinquish as much of her on-call responsibility as she wanted, just because she did not *like* being on-call. (See pp. 4-5, supra.) Indeed, Ms. Schill was allowed by Ms. Patten to give up so much of her call that she once went a four-month stretch where she took exactly <u>one</u> on-call shift. (Id.) And when Ms. Schill complained about having to "take back" just <u>part</u> of her call hours (previously being covered by optional sonographer Lauren Polking), Ms. Patten found someone else to take them. (Porter dep., pp. 26-28, 51 and Ex. 6; Daniels dep., pp. 19-20.)

After terminating Plaintiff, Defendant hired a Caucasian to replace her. (Def's Interrogatory Responses, No. 4, attached.) And it has offered no legitimate, non-discriminatory reason for why Ms. Patten was so much more accommodating to her Caucasian employee Rachel Schill than she was to Plaintiff, when they <u>each</u> had a need (or in Ms. Schill's case, just a *desire*) to find coverage for their on-call hours. If Ms. Patten had shown the same consideration to Plaintiff – an African American – that she showed to Ms. Schill, and had just allowed her to find coverage for the hours in question, Plaintiff would not have lost her job, as <u>several</u> people were interested in taking the hours. (See p. 10, supra.)

A reasonable jury could readily conclude from this evidence that Plaintiff's race was a motivating factor in her discharge. Defendant's Motion should therefore be denied on this claim.

### IV.   <u>CONCLUSION</u>

For these reasons, Plaintiff respectfully requests that Defendant's Motion be overruled.

/s/ Stephen E. Imm
Stephen E. Imm (0040068)
*Attorney for Plaintiff*
Finney Law Firm, LLC
4270 Ivy Pointe Blvd., Suite 225
Cincinnati, Ohio 45245
Telephone: (513) 943-5678
Facsimile: (513) 943-6669
Email: Stephen@finneylawfirm.com

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing Plaintiff's Memorandum in

Opposition to Defendant's Motion for Summary Judgment was electronically filed on January 12,

2018 through the CM/ECF for the USDC for the Southern District of Ohio and electronically

served upon all counsel of record on the same date through the CM/ECF for the Southern District

of Ohio.

/s/ Stephen E. Imm
Stephen E. Imm (0040068)