UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| KIMBERLY A. PORTER | : | CASE NO. 1:16-cv-00978 |
| | : | |
| Plaintiff | : | Judge William O. Bertelsman |
| | : | |
| v. | : | Magistrate Judge Stephanie K. Bowman |
| | : | |
| TRIHEALTH, INC. | : | **REPLY MEMORANDUM IN** |
| | : | **SUPPORT OF THE MOTION FOR** |
| Defendant | : | **SUMMARY JUDGMENT OF** |
| | : | **DEFENDANT TRIHEALTH, INC.** |

## I.  INTRODUCTION

Plaintiff Kimberly Porter's ("Ms. Porter") response memorandum provides no viable reason why this Court should refrain from granting summary judgment to Defendant TriHealth, Inc. ("TriHealth"). The material, record facts establish that Ms. Porter sought an exemption from one of the sonographer's essential job functions rather than a reasonable accommodation which would permit her to refrain from performing a non-essential job function. Her ADA claim fails. Similarly, because she could not perform an essential function of the sonographer position and because she sought a permanent schedule change via the guise of FMLA leave, her FMLA claims fail.

Ms. Porter's FMLA retaliation and race discrimination claims both fail because she can show no causal connection between her FMLA leave or her race and her discharge where it is undisputed that she was discharged because she was permanently unable to perform the essential on-call job function from 9:00 p.m. through 6:00 a.m. and she was unsuccessful in her attempts to find another position within TriHealth. Ms. Porter also fails to meet her burden to show that TriHealth's legitimate,

non-discriminatory reason for her discharge was a pretext for either FMLA retaliation or race discrimination.

Once the hyperbole, distorted facts, and misinterpreted law in Ms. Porter's response memorandum are cast aside, the material, record facts and the governing law establish that TriHealth should be entitled to summary judgment.

## II.    PLAINTIFF'S FACTUAL RECITATION

There is nothing in Ms. Porter's description of the facts in this matter which creates a genuine issue of material fact which would preclude summary judgment in this matter.  Nonetheless, TriHealth must point out a few areas where Ms. Porter takes extreme liberties with the actual record facts.  On Page ID 878, Ms. Porter states:  "The on-call sonographer must be able to get to the hospital within an hour of being contacted, but otherwise is free to do as he or she wishes while 'on-call.'" (Doc. 25 at Page ID 878)  That statement is untrue and ignores multiple individuals' testimony regarding the actual disruption the "on-call" responsibility causes to someone's life.

For example, Ms. Bauer testified:  "The additional stress is knowing that at 9 o'clock I'm on-call for the night.  So you cannot drink alcohol.  You cannot go to the movies.  You cannot go to parties with your friends."  (Doc. 20 at Page ID 725-26)  She added: "[Y[ou do not sleep well when you're on call.  Seriously.  I've been doing call for 35 years, basically off and on my whole career and you just do not sleep well." (*Id.* at 726)  Ms. Schill stated:  "Being on-call is very stressful.  It limits greatly the things that you can and cannot do.  You have to stay – you can't, you can't go to a movie unless you feel like wasting the money because ten minutes into the movie your pager goes off and you have to go to the hospital.  You can't take vacation.  You can't take a long weekend. You can't have a glass of wine.  You can't  -- you're tied to the hospital.  (Doc. 18 at Page

ID 600)  Similarly testifying about the disruption caused by the on-call responsibility, Ms. Korblick stated:  "But knowing that you have to get up, you know, or potentially get up, you don't sleep as well, I don't think, as what you normally would.  And it kind of inhibits what you can do with your evening."  (Doc. 17 at Page ID 517)

On Page ID 878-79, Ms. Porter discussed the pay structure for the on-call duty and implies that it would be simple to find someone to cover another's on-call duties.  (Doc. 25 at Page ID 878-79)  However, Ms. Korblick, one of the "optional" sonographers who took on a lot of other people's on-call hours to make money (Doc. 17 at Page ID 512), testified that the prevailing thought among all the sonographers regarding the on-call responsibility was "we all hate it."  (*Id*. at Page ID 517)  Ms. Polking, the other "optional" sonographer who took everyone's call for nearly the first year she worked at Good Samaritan because she needed the income for child care, similarly testified that "[n]obody liked taking call."  (Doc. 22 at Page ID 843-44)  It was not a situation where it was easy to find someone to cover another's on-call responsibility.  (Doc. 13 at Page ID 155)  These "optional" employees did it to make ends meet, but even they testified that they disliked it.  As seen by the fact that both Ms. Korblick and Ms. Polking found other jobs relatively quickly, hiring someone to do nothing but cover on-call duties is rarely going to be a long-term solution.

On Page ID 881, Ms. Porter states:  "None of the sonographers in Plaintiff's department complained about this schedule."  (Doc. 25 at Page ID 881)  That is untrue.  Ms. Porter refrains from citing to Rachel Schill's deposition because Ms. Schill testified that she was "not pleased with the idea of always having to have someone cover call after 9:00 p.m.," and she is "sure" that her displeasure "was mentioned several times to co-workers, possibly Dawn" Patten.  (Doc. 18 at Page ID 607)  Ms. Schill testified that she

was looking for another job at one point, in part, because of that issue.  (*Id*. at 608)  Ms. Schill also recalls Jackie Bauer complaining about having to cover Ms. Porter's on-call responsibility after 9:00 p.m.  (*Id*.)  Ms. Bauer also testified that she was unhappy with having to take Ms. Porter's overnight on-call responsibility, but she recalls that her "vent[ing]back and forth" with the other sonographers was about being on-call in general.  (Doc. 20 at Page ID 724-25, 729-30)  Ms. Patten testified that she recalled Ms. Schill complaining about Ms. Porter's arrangement.  (Doc. 13 at Page ID 182)

Ultimately, none of this is essential to dispositive issues in this matter, but the actual record testimony on these points clearly undercuts an essential theme to Ms. Porter's response memorandum – that the overnight on-call responsibility was no big deal and there is a cadre of individuals who are ready, willing, and happy to perform the overnight on-call responsibility.  These misrepresentations also show that many other statements Ms. Porter makes throughout her response memorandum should be viewed with skepticism.[1]

## III.  ARGUMENT

### A.  Ms. Porter's ADA Claim Fails as She is Seeking an Exemption From an Essential Function of the Sonographer Position.

"As a threshold matter in every disability-discrimination claim, a plaintiff must demonstrate that (1) she is disabled; and (2) she is otherwise qualified for the position despite her disability, either with or without a reasonable accommodation."  *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 391 (6th Cir. 2017) (citation and internal quotation omitted).  "An employee is deemed qualified only if she can perform all of the

---

[1] Again, none of them make a difference to the dispositive issues, but the myriad of uncited "factual" statements made by Ms. Porter should be ignored.  *See Altman v. Grant Cty. Sch. Dist.*, No. CIV.A. 2009-185 WOB, 2012 WL 845294, at *2 (E.D. Ky. Mar. 12, 2012) ("As Plaintiff has not challenged Defendants' motion with citations to the record, she has failed to properly support her contention that a genuine issue of material fact exists.").

essential functions of her job, whether accommodated or not." *Id.* (citing 42 U.S.C. § 12111(8)).  Because Ms. Porter is seeking an exemption from an essential function of the sonographer position, her ADA claim fails.  *See E.E.O.C. v. Ford Motor Co.*, 782 F.3d 453, 463 (6th Cir. 2015) (citation omitted).

### 1.    The on-call responsibility is an essential function of the sonographer position at Good Samaritan Hospital.

Ms. Porter is correct that whether a job function is "essential" is a question of fact, but in order for her to avoid summary judgment, she must be able to show that there is a <u>genuine</u> issue of <u>material</u> fact as to whether the on-call responsibility is an essential function of the sonographer position at Good Samaritan Hospital.  *See Hoskins v. Oakland Cty. Sheriff's Dep't*, 227 F.3d 719, 731 (6th Cir. 2000) ("[B]ecause Hoskins has failed to create a genuine issue of material fact as to whether restraining inmates is an essential function or as to whether she could perform the essential functions of the deputy one position with reasonable accommodation, we affirm the district court's grant of summary judgment to the defendants.").  Because there is no genuine issue of material fact on this issue, summary judgment for TriHealth is appropriate.

Ms. Porter's primary argument that the overnight on-call responsibility is not essential (one that TriHealth anticipated in its opening motion) suffers from a crucial flaw – she does not dispute that TriHealth must have someone on-call at <u>all</u> times (which could obviously include overnight hours) who can perform the sonographer duties when an emergency arises.  (Doc. 14 at Page ID 325)  Ms. Porter tries to get around this fact by arguing that because sonographers are permitted to make arrangements to have each other cover one another's on-call responsibility and because TriHealth has used "optional" employees to help alleviate the on-call burden that this

- 5 -

means that the on-call responsibility (in particular, overnight on-call) is not essential to the sonographer position.

But, what happens if another regular sonographer or an "optional" sonographer develops a disability which precludes him or her from covering the overnight on-call hours?  Would the ADA require TriHealth to keep that person employed and hire another employee who could work those hours?  And what if that new-hire then develops a disability that prevents him or her from working the overnight on-call hours?  Would TriHealth have to keep that employee and hire yet another to cover those hours?

The answer to these rhetorical questions is "no."  "The ADA . . . neither requires an employer to accommodate individuals by shifting an essential job function onto others, nor to hire new employees to perform certain functions or duties of a disabled employee's job which the employee cannot perform by virtue of [her] disability." *Meade v. AT&T Corp.*, 657 F. App'x 391, 397 (6th Cir. 2016) (internal citations and quotations omitted).  If the ADA did require employers to hire additional people or assign essential functions to other employees in order to permit a disabled employee to remain in her position, such a "rule would render the essential-function step of an ADA analysis meaningless." *Wardia v. Justice & Pub. Safety Cabinet Dep't of Juvenile Justice*, 509 F. App'x 527, 531 (6th Cir. 2013).  In other words, no duties of any job would be "essential" because the ADA would require an employer to hire someone else (or shift the duties to a co-worker) who can perform the duties.

Ms. Porter's misapprehension of this issue is no more evident than when she states:  "Further, the 'consequences of not requiring the incumbent to perform the function' are non-existent, as others (particularly the optional sonographers) are quite willing to take additional overnight call responsibility, and are financially incentivized to

maximize their on-call hours." (Doc. 25 at Page ID 889) Setting aside the inaccuracies with this statement (discussed above), Ms. Porter is incorrectly trying to merge the "essential function" issue with the "reasonable accommodation" issue. That there may be a few other willing and able employees to take on a responsibility does not mean that the responsibility is less consequential or non-essential. TriHealth <u>must</u> have a sonographer on-call at all times precisely because of the severe consequences that could result if a sonographer is not on-call when a medical emergency arises.[2]

Mr. Porter's analysis also ignores the fact that there is a very small pool of sonographers who could perform those duties. *See* 29 C.F.R. § 1630(n)(2)(ii) ("The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed."). There are only three other regular sonographers and, at most, two "optional" sonographers. (Doc. 13 at Page ID 160-61; Doc. 18 at Page ID 574) The three other regular sonographers and the two "optional" sonographers have certifications and specialized training to perform ultrasounds. (Doc. 17 at Page ID 502 Doc. 18 at Page ID 570-71; Doc. 19 at Page ID 639; Doc. 20 at Page ID 712; Doc. 22 at Page ID 840) This is not a job that TriHealth could pull any random person in to perform.

The First Circuit dealt with a similar argument in *Phelps v. Optima Health, Inc.*, 251 F.3d 21 (1st Cir. 2001). There, the nurse plaintiff was suffering from a disability which precluded her from lifting more than twenty pounds. *Id.* at 24. At first, the defendant employer created a position of "medication nurse" which did not require the plaintiff to lift anything heavy. *Id.* But, when a nurse shortage occurred, the plaintiff

---

[2] Mr. Daniels testified that the department switched to the current framework (an on-call rotation) because an incident previously occurred where no sonographer responded to an after-hours emergency need for ultrasound services. (Doc. 19 at Page ID 641)

had to switch back to performing regular nurse duties.  *Id.*  When this happened, many of the plaintiff's co-workers voluntarily assumed the lifting tasks that the plaintiff could not perform.  *Id.*  After over two years of that arrangement, a decision was made that because the plaintiff could not perform an essential function of her position (*i.e.*, lifting), she would be given the opportunity to find an internal position to which she could transfer, failing which she would be discharged.  *Id.*

Rejecting the plaintiff's argument that lifting was not essential because other employees would (and did) voluntarily assist her in those duties, the First Circuit "agree[d] with the Seventh Circuit that evidence that accommodations were made so that an employee could avoid a particular task 'merely shows the job could be restructured, not that [the function] was non-essential.'"  *Id.* at 26 (quoting *Basith v. Cook Cnty.*, 241 F.3d 919, 930 (7th Cir. 2001)).  The same is the case here.  The fact that all the sonographers, including Ms. Porter, were permitted to make arrangements to have each other cover one another's on-call responsibility and/or seek out an "optional" employee to cover the on-call responsibility "merely shows the job could be restructured, not that [the on-call function] was non-essential."  *Id.*

Also, as TriHealth anticipated in its opening motion, Ms. Porter notes that the written job description does not state that the on-call responsibility is an essential function of the job.  But this is unimportant where Ms. Porter knew that sonographers had to be on-call for patient emergencies when she was hired (Doc. 14 at Page ID 324-25) and everyone in her department had an on-call responsibility.  (*Id.* at Page ID 324)  *See Hargett v. Jefferson Cty. Bd. of Educ.*, No. 17-5368, 2017 WL 5664922, at *5 (6th Cir. Oct. 27, 2017) (holding the job duty to be essential based upon the plaintiff's "initial acceptance of this duty when she first began teaching at [the school], and the

undisputed fact that other teachers at [the school] were assigned this duty"); *see also Koss v. Lincare, Inc.*, No. 11-11932, 2012 WL 1843031, at *13 (E.D. Mich. May 21, 2012) (holding that the lack of a job description listing the on-call responsibility as an essential job function did not preclude a finding that it was essential where "the actual functioning of Defendant's business demonstrates that the on-call rotation was an essential part of a sales representative's job at the Houghton Lake center").

In a footnote at the end of this section of her response memorandum, Ms. Porter cites to three cases and claims that they involve "circumstances much closer to those present here," but she makes no other attempt to analogize them to the case at bar. (Doc. 25 at Page ID 890 n.1) While all three of those cases involve analysis of an on-call responsibility as an essential function, there is something very important missing from all of those cases – none of them discuss the fact that shifting the on-call responsibility from the plaintiff means that it must be shifted to another employee and how that impacts the analysis. Those cases adopt the same faulty analysis as Ms. Porter by merging the "essential function" and "reasonable accommodation" issues.

"In failure-to-accommodate claims where the employee requests an accommodation that *exempts* her from an essential function, the essential functions and reasonable accommodation analyses run together." *Ford Motor Co.*, 782 F.3d at 763 (citation and internal quotations omitted). "One conclusion (the function is essential) leads to the other (the accommodation is not reasonable)." *Id.* But the reverse is not true. Just because an employee can identify an accommodation that will exempt her from performing a certain function does not lead to the conclusion that the function is non-essential. Otherwise, "the essential-function step of an ADA analysis [would be] meaningless." *Wardia*, 509 F. App'x at 531.

The on-call responsibility, and in particular the overnight on-call responsibility, is an essential function of the sonographer job.

### 2.   Ms. Porter never proposed a reasonable accommodation.

"It is well-settled that if a disabled employee requires an accommodation, she bears the burden of proposing an accommodation and proving that it is reasonable." *Olivan v. Henry Ford Hosp.*, No. 11-CV-13950, 2013 WL 1314952, at *6 (E.D. Mich. Mar. 29, 2013) (citations omitted).  The only accommodation Ms. Porter sought in response to TriHealth engaging in the interactive process was:  "Waive employee from taking call after 9PM and before 6AM, this will allow uninterrupted rest periods that will help reduce her lupus flare-ups."  (Doc. 12-7 at Page ID 133)  In her Complaint, Ms. Porter describes her accommodation request as "adjusting the division of on-call hours among the ultrasound technologists, with her taking more on-call hours than any of the others."  (Doc. 1 at Page ID 4)

In her response memorandum, Ms. Porter states that "there were multiple reasonable accommodations available," but then proceeds to discuss use of the "optional" employees as a means to create "a modified call schedule" for Ms. Porter. (Doc. 25 at Page ID 891)  Ms. Porter also mentions that TriHealth could have used "an agency to take some limited overnight call."  (*Id.*)  So, the first two of the "multiple reasonable accommodations available" include TriHealth shifting the overnight on-call responsibility to someone else.  "An employer that decides to reassign the essential functions of a disabled employee's job to another employee may justly be praised." *Koss*, 2012 WL 1843031, at *13.  "An employer that does not, however, is not subject to civil liability under the ADA."  *Id.*; *see also Hargett*, 2017 WL 5664922, at *4 ("[I]t was unreasonable to expect either a teaching assistant or a parent to be readily available on

an 'as-needed' basis, and it would have been an undue hardship for JCBE to hire an assistant to carry out this duty, even on a part-time basis.").

The third "accommodation" Ms. Porter mentions is not an accommodation at all. She says that "[i]t also may have been possible for [Ms. Porter] to seek her physician's permission to <u>take</u> overnight call on those occasions – likely to be very rare – when a coworker was not able and willing to do so."  (Doc. 25 at Page ID 891)  If Ms. Porter's limitations on performing the on-call responsibility were more flexible than she let on, it was her responsibility to make that known to TriHealth.  *See E.E.O.C. v. AT&T Mobility Servs. LLC*, No. 10-13889, 2011 WL 6309449, at *11 (E.D. Mich. Dec. 15, 2011) ("If her 40–hour work week restriction was flexible, as she now suggests, it was her burden to make this information known to AT & T.").  It is undisputed that the only "accommodation" she proposed to TriHealth was waiving her on-call responsibility from 9:00 p.m. until 6:00 a.m.  (Doc. 12-7 at Page ID 133)

Last, Ms. Porter generally takes issue with TriHealth's "interactive process," but she fails to identify what reasonable accommodation could have been reached if TriHealth had engaged in the exact "interactive process" she desired.  *See Gober v. Frankel Family Tr.*, 537 F. App'x 518, 522 (5th Cir. 2013) ("Gober also argues Management Support should have engaged in an 'interactive process' to determine an appropriate accommodation.  Yet Gober specifically told Management Support that being on call was 'not acceptable.'").  Ms. Porter did not propose a reasonable accommodation, and she still has not done so to date.

### B.  <u>Ms. Porter's FMLA Claims Fail as a Matter of Law.</u>

Ms. Porter does not dispute that entitlement to the FMLA leave is a precondition to interference and retaliation claims.  *See Morris v. Family Dollar Stores of Ohio, Inc.*,

320 F. App'x 330, 338 (6th Cir. 2009) ("Because Morris's leave was not on account of a serious health condition, he cannot establish the first element, that he engaged in an activity protected by the FMLA"); *Verhoff v. Time Warner Cable, Inc.*, 478 F. Supp.2d 933, 942 (N.D. Ohio 2006), *aff'd*, 299 F. App'x 488 (6th Cir. 2008) (granting summary judgment for defendant on FMLA retaliation claim, where plaintiff had already exhausted his full twelve weeks of FMLA leave).  Ms. Porter was not legally entitled to the intermittent or reduced schedule leave as the FMLA is not designed to be used to effectuate a permanent schedule change.  Her interference and retaliation claims fail for this reason.  Ms. Porter's FMLA claims also fail because she was unable to perform the essential functions of the sonographer job.

Additionally, Ms. Porter's FMLA retaliation claim fails because there is no evidence of a causal connection between her FMLA leave and her discharge nor is there any evidence that TriHealth's legitimate, non-discriminatory reason for her discharge was a pretext for FMLA retaliation.

        **1.     Ms. Porter was not entitled to the FMLA leave she sought as intermittent or reduced schedule leave is not designed to be used to effectuate a permanent schedule change.**

Ms. Porter does not offer any response to TriHealth's argument in this regard. The only place in her response memorandum where she conceivably touches on this issue is where she states:  "*In other words, Plaintiff needed medical leave, intermittently, for those (rare) occasions when she would otherwise be called into work during those overnight hours.*"  (Doc. 25 at Page ID 892)  Ms. Porter's discussion of this issue distorts the basis for having someone on-call.  The purpose of having someone on-call is to ensure that someone is <u>always</u> available during the time period for which that person is on-call.  Ms. Porter's attempt to reframe her leave as "intermittent"

by referencing only the times when she would actually be called in to perform the duties is clever, but unfaithful to the actual purpose of having an employee on-call.

For the reasons TriHealth sets forth in its opening motion (to which Ms. Porter offers no response), Ms. Porter was not legally entitled to the intermittent or reduced schedule leave as the FMLA is not designed to be used to effectuate a permanent schedule change. Her FMLA claims should be dismissed for this reason.

### 2. Ms. Porter's FMLA claims also fail because she was unable to perform the essential functions of the sonographer job.

Ms. Porter's only response to this section of TriHealth's opening motion is her attempt to rely on the Sixth Circuit's opinion in *Verhoff v. Time Warner Cable, Inc.*, 299 F. App'x 488 (2008). However, as TriHealth pointed out in its opening motion, this case supports TriHealth's argument, not Ms. Porter's.

Ms. Porter does not dispute that "the FMLA does not require an employer to retain an employee who cannot do [her] job." *Id.* at 496. Unlike Ms. Porter, the plaintiff in *Verhoff*, a cable installer, was limited in the total number of hours he could work in a week, but was not prohibited from working "standby" or "on-call" hours. *Id.* In fact, the Sixth Circuit's analysis of this issue starts by noting that the plaintiff "could work the standby hours so long as his total hours did not add up to more than forty per week." *Id.*

That is not the case here. Ms. Porter is unable to work the essential functions of the sonographer job – *i.e.*, full on-call responsibility. This is not a situation like the plaintiff in *Verhoff* where the employee is stating that he could perform the essential "on-call" or "standby" function if the employer reduces the employee's "regular" hours.

In her response memorandum, Ms. Porter states: "If working 'more than full-time' cannot be an essential function of a job for purposes of the FMLA, it would be

nonsensical to hold that being 'on call' – *in addition to working one's regular shifts* – somehow <u>can</u> be an 'essential function' under the FMLA."  But one must look no further than Ms. Porter's own case for an example of why such a holding makes sense.  Here, there are multiple sonographers on duty during regular hours, but only one sonographer who is on-call at all other times.  Further, it is undisputed that the on-call responsibility (particularly, the overnight on-call responsibility) is the least desirable part of the job.  (Doc. 17 at Page ID 512; Doc. 18 at Page ID 600; Doc. 20 at Page ID 725-26; Doc. 22 at Page ID 843-44)  With these two facts combined, it is not difficult to conclude that a sonographer's ability to work the full on-call hours is essential even where a sonographer may not be able to work more than forty hours total in a week.

Because Ms. Porter cannot perform the essential on-call function of the sonographer job, she is not protected by the FMLA.

> **3.  Ms. Porter cannot establish the requisite causal connection to support an FMLA retaliation claim nor can she show that TriHealth's reason for her discharge was a pretext for FMLA retaliation.**

Ms. Porter's FMLA retaliation claim fails for the two reasons set forth above.  Because she cannot establish a *prima facie* FMLA case, the causal connection and pretext analyses should be irrelevant.  *See Morris*, 320 F. App'x at 338 ("Because we find that Morris did not establish a *prima facie* FMLA case, Capestany's statements about Morris's termination are irrelevant to our analysis.").  However, even if she was entitled to intermittent FMLA leave, Ms. Porter cannot establish that there is any causal connection to support an FMLA retaliation claim nor can she show that TriHealth's reason for her discharge was a pretext for FMLA retaliation.

The record evidence is clear that TriHealth discharged Ms. Porter because it determined that it could not accommodate her permanent inability to perform the essential on-call job function from 9:00 p.m. through 6:00 a.m. and she was unsuccessful in her attempts to find another position within TriHealth.  (Doc. 14 at Page ID 383-87; Doc. 14-6 at Page ID 462, 471; Doc. 12 at Page ID 115-16; Doc. 1 at Page ID 4)  Also, Ms. Porter took FMLA leave for years prior to her discharge and does not claim there was any problem.  (Doc. 14 at Page ID 369-70, 374; Doc. 14-1 at Page ID 421-28)

In her response brief, Ms. Porter cites to the testimony of Chassity Fender, claiming that it shows that Ms. Patten was hostile toward Ms. Porter's FMLA usage.  It does not.  Ms. Fender testified that when Ms. Porter applied for a position in Ms. Fender's department, Ms. Patten told Ms. Fender that Ms. Porter had "tardy attendance issues" for "showing up late."  (Doc. 21 at Page ID 779)  There is no mention of FMLA usage.  In fact, Ms. Porter testified that she had lupus flare-ups throughout 2015 and that she was able to use FMLA leave.  (Doc. 14 at Page ID 374)  The claim that Ms. Patten had animus toward Ms. Porter is further belied by Ms. Fender's testimony that Ms. Patten told her that Ms. Porter was "a great person" with a "good attitude."  (Doc. 21 at Page ID 781)  Ultimately, Ms. Fender's reason for not hiring Ms. Porter had nothing to do with attendance, FMLA, or Ms. Patten's input at all – it was because Ms. Porter "was not registered in x-ray and [Ms. Fender] was looking for a technologist who was registered in multiple modalities."  (*Id*. at Page ID 782)

Ms. Porter also tries to rely on testimony from Justice Daniels (Doc. 25 at Page ID 881, 894), but she distorts it.  Mr. Daniels testified that he overheard Jackie Bauer, discussing her need to pick up extra hours on the phone with an unknown person, say that Ms. Patten previously said something about Ms. Porter recently calling off sick.

(Doc. 19 at Page ID 665)  When Ms. Porter's counsel attempted to rephrase Mr. Daniels' testimony on this point to mean that Ms. Patten had said that Ms. Porter would not "be here much longer" because she "has been calling off sick," Mr. Daniels responded, "No . . . on the phone [Ms. Bauer] said, according to Dawn, the rate at which Kim Porter has been calling off sick [Ms. Bauer] should wait and maybe between two months or three months, [Ms. Bauer] should be okay and get enough hours so [] that she doesn't have [to] worry about going to Bethesda North or somewhere else.  So it wasn't like [Ms. Porter] wasn't going to be here much longer.  That wasn't what I heard."  (*Id*. at 669-70)  In other words, because Ms. Porter was calling in sick, there would be more hours for Ms. Bauer to pick up, not that Ms. Porter was going to be let go because she was calling in sick.  Ms. Porter's attempt to construe it in that manner is not supported.[3]

Further, setting aside the lack of causation, Ms. Porter's claim also fails because she has not offered any evidence to show that TriHealth's legitimate, non-discriminatory reason for her discharge was a pretext for FMLA retaliation.  TriHealth has offered a legitimate, non-discriminatory reason for Ms. Porter's discharge.  (Doc. 14 at Page ID 383-87; Doc. 14-6 at Page ID 462, 471; Doc. 12 at Page ID 115-16; Doc. 1 at Page ID 4)

Ms. Porter has the burden to "prove by a preponderance of the evidence that the articulated reason was a 'pretext' for discrimination" or retaliation.  *Laws v. HealthSouth N. Kentucky Rehab. Hosp. Ltd. P'ship*, 828 F. Supp. 2d 889, 921 (E.D. Ky. 2011), *aff'd*, 508 F. App'x 404 (6th Cir. 2012) (citation omitted).  She makes no attempt to address the issue of pretext in her response memorandum.  Despite Ms. Porter's

---

[3] To the extent this could be twisted to infer some sort of animus from Ms. Patten, this testimony from Mr. Daniels is double hearsay as it is his testimony about what he overheard Ms. Bauer say about what she heard from Ms. Patten.  "The Court is unable to consider such hearsay statements when ruling on [a] motion for summary judgment." *Martin v. AutoZone, Inc.*, 411 F. Supp. 2d 872, 878 n.2 (S.D. Ohio 2005) (citation omitted).

failure to address the issue of pretext at all, even if this Court were to undertake a *sua sponte* search of the record (which it is not required to do, Civ. R. 56(c)(3)), it would find no evidence upon which a reasonable jury could conclude that TriHealth's reason for discharging Ms. Porter was a pretext for FMLA retaliation.

### C.   There is No Evidence Upon Which Ms. Porter Could Support a Race Discrimination Claim.

Similar to her arguments regarding her ADA claim, Ms. Porter's race discrimination claim is based upon a fundamental misunderstanding (or an intentional misrepresentation) of how the on-call responsibility worked among the sonographers. The crux of Ms. Porter's argument is that Ms. Patten "permitted Plaintiff's Caucasian co-worker – Rachel Schill – to relinquish as much of her on-call responsibility as she wanted, just because she did not *like* being on-call."  (Doc. 25 at Page ID 895)

The truth is that <u>any</u> of the regular sonographers, including Ms. Porter, were allowed to switch on-call days with the other sonographers and were allowed to seek out the use of the "optional" sonographers to cover their on-call responsibility.  (Doc. 13 at Page ID 204-206, 246)  But, <u>none</u> of the regular sonographers was allowed to "relinquish" his or her on-call responsibility.  (*Id*.)  All the regular sonographers are permitted to try to find someone else to work their on-call responsibility, but it is the regular sonographer's responsibility to ensure there is coverage.  (Doc. 18 at Page ID 586; Doc. 19 at Page ID 652)

The only way that Ms. Porter could show evidence of race discrimination would have been if Ms. Schill had also been unable to perform the essential on-call function, but TriHealth declined to similarly terminate her employment.  That is not what we have here.  The fact that Ms. Schill (and <u>every</u> other sonographer) was permitted to find

other sonographers to cover her on-call duties, while still retaining the ultimate responsibility over that essential job function, has no bearing on Ms. Porter's claim.

Ms. Porter's race discrimination claim also fails because, similar to her FMLA retaliation claim, she cannot show that TriHealth's legitimate, non-discriminatory reason for her discharge was actually a pretext for race discrimination.  Ms. Porter has offered no argument or evidence upon which it could be said that she has met her burden of establishing that a reasonable jury could conclude that her discharge was a pretext for race discrimination rather than because she was permanently unable to perform the essential on-call job function from 9:00 p.m. through 6:00 a.m. and she was unsuccessful in her attempts to find another position within TriHealth.

## IV.    CONCLUSION

For the foregoing reasons and those set for in its opening motion, TriHealth respectfully submits that its motion for summary judgment should be granted.

Respectfully submitted,

/s/ Doreen Canton
OF COUNSEL:                                    Doreen Canton (0040394)
Evan T. Priestle  (0089889)                    Taft Stettinius & Hollister LLP
Taft Stettinius & Hollister LLP                425 Walnut Street, Suite 1800
425 Walnut Street, Suite 1800                  Cincinnati, Ohio  45202
Cincinnati, Ohio  45202                        Tel:  (513) 381-2838
Tel:  (513) 381-2838                           Fax:  (513) 381-0205
Fax:  (513) 381-0205                           Email:  canton@taftlaw.com
Email:  epriestle@taftlaw.com
                                               Trial Attorney for Defendant TriHealth, Inc.

- 18 -

## **CERTIFICATE OF SERVICE**

      I certify that on February 2, 2018, I electronically filed the Reply Memorandum in Support of the Motion for Summary Judgment of Defendant TriHealth, Inc. with the Clerk of Courts via the CM/ECF System, which will provide notice to Stephen E. Imm, Finney Law Firm LLC, 4270 Ivy Pointe Boulevard, Suite 225, Cincinnati, Ohio 45245.

                                     /s/ Doreen Canton
                                     Doreen Canton (0040394)