CIVIL ACTION NO. 1:16cv00978-WOB


KIMBERLY A. PORTER                                        PLAINTIFF

VS.                    <u>MEMORANDUM OPINION AND ORDER</u>

TRI-HEALTH, INC.                                          DEFENDANT


This is an employment discrimination case. Plaintiff Kimberly Porter has sued TriHealth, Inc. alleging that TriHealth's termination of her employment violated the Americans with Disabilities Act ("ADA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), the parallel Ohio statute (O.R.C. § 4112), and the Family and Medical Leave Act ("FMLA").

This matter is before the Court on Defendant's motion for summary judgment. (Doc. 15). The Court previously heard oral argument on this motion and took the matter under advisement. (Doc. 29). After further study, the Court now issues the following Memorandum Opinion and Order.

### *Factual and Procedural Background*

Plaintiff Kim Porter ("Porter") alleges that her employer, Defendant TriHealth ("Defendant") discriminated against her on the

basis of her disability (lupus)[1] and her race, and also interfered with her FMLA rights.

Porter began working for Defendant at Defendant's Good Samaritan Hospital location in April 2009 as a sonographer in the Radiology Department. (Doc. 14, Porter Dep., 11.)[2] In addition to working regular shifts, Porter was assigned certain on-call responsibilities, which are at the center of this dispute. (*Id.* at 14.)

## A. The On-Call Responsibility in the Radiology Department

Sonographers in the Radiology Department work regularly scheduled shifts during the hours the department is "open" (the department is staffed M-F, 7 a.m.-5 p.m., Sat., 8 a.m.-noon). However, to account for hospital emergencies, one sonographer must be "on-call" even when the department is closed. (*Id.* at 15.) Therefore, the sonographers are assigned "on-call responsibility" for the overnight hours for one day each week (5 p.m.-7 a.m.), every fourth or fifth[3] weekend (12 p.m. Saturday through 7 a.m. Monday), and occasionally holidays (which are assigned through the rotation of sonographers). (*Id.* at 17.) Someone must be on-call

---

[1] The parties do not dispute that lupus constitutes a disability under the ADA.
[2] Sonographers perform diagnostic ultrasound exams. (*Id.* at 15).
[3] This depends on the number of sonographers employed in the department. The sonographers rotate and each takes one weekend in turn.

during the hours the department is not staffed. (Doc. 13, Patten Dep., at 13, 18-19, 20.)

At relevant times, the sonography department consisted of four regular sonographers and one or two "optional" sonographers. (Doc. 14, Porter Dep., at 13-14); (Doc. 13, Patten Dep., at 21-22.) An "optional" sonographer is generally hired to work in the department's weekend and on-call rotations and would also fill in if someone was sick or had a day off. (Doc. 17, Korblick Dep., at 9-10.) Optional sonographers were not scheduled for regular shifts, and so they worked "regular" hours only when they picked them up from someone else. (*Id.* at 10.) Dawn Patten ("Patten") supervised the sonographers and was Porter's direct boss.

Although each regular sonographer was assigned their on-call shifts, the sonographers were permitted to trade on-call responsibilities so long as someone was responsible for all on-call hours. (Doc. 13, Patten Dep., at 14, 40, 50.) The testimony is clear that everyone "hated" to be on-call, which led to a fair amount of shift-trading. Everyone agrees that when on-call, the employee had to respond to the hospital within one hour, could not drink alcohol, and was limited in their activities because one could not predict when one might be called in. (Doc. 17, Korblick Dep., at 22); (Doc. 22, Poelking Dep., at 12); (Doc. 18, Schill Dep., at 14.) Employees also testified that they did not sleep

well when on-call. (Doc. 17, Korblick Dep., at 22); (Doc. 18, Schill Dep., at 15); (Doc. 20, Bauer Dep., at 21.)

Some sonographers — usually the optional sonographers — would consistently take the lion's share of the on-call responsibility, and even extra regular shifts, to earn additional money, which reduced the on-call burden on the regular sonographers. (Doc. 13, Patten Dep., at 23-24); (Doc. 17, Korblick Dep., at 17.)

Sonographers were compensated $3.00 for every hour they were on-call, regardless of whether they were actually called in. (Doc. 17, Korblick Dep., at 18-19.) If they were called in, they were compensated for a minimum of three hours, regardless of whether they were at the hospital for two minutes or three hours.[4] (*Id.*) Because optional sonographers were not assigned any regular shifts, the only way they could make more money was to take on-call shifts and regular sonographers' shifts. And, because working these shifts was disliked, taking an optional position was generally a means to get a foot in the door with the hopes of later transferring to other departments and positions.

Due to the willingness of some employees to pick up the on-call shifts, months or an entire year could pass with the regular sonographers not having any on-call responsibilities. (Doc. 13,

---

[4] It is unclear from the record whether they are compensated their regular rate per hour only or their regular rate plus the $3.00 per hour.

Patten Dep., at 14.)   Indeed, one sonographer, Rachel Schill, particularly disliked the on-call responsibility, and she almost never worked her on-call shifts, as someone else would usually take them for her.  (Doc. 18, Schill Dep., at 37.)

However, even if another sonographer volunteered to take the hours, the individual originally assigned remained responsible for those hours.  (Doc. 13, Patten Dep., at 40); (Doc. 18, Schill Dep., at 23.)   So, if the volunteering sonographer became unavailable, it was the original sonographer's responsibility either to cover that shift or find someone else to cover it.   A sonographer's willingness to take on-call hours could change without notice or reason. (*See* Doc. 17, Korblick Dep., at 36) (explaining what on-call responsibilities she would generally pick up from the regular sonographers but noting that "sometimes [she'd] be lazy and [she] wouldn't").   No matter what, a sonographer had to be on-call overnight and on weekends and holidays, and so someone always had the ultimate responsibility for the on-call shifts.  (Doc. 13, Patten Dep., at 56.)

### B.   Porter's Employment and On-Call Responsibilities

Porter, like all regular sonographers, had regular shifts in the Radiology Department, and she also had on-call responsibilities.   She was responsible for the overnight on-call responsibility on Tuesdays, every fourth weekend, and then holidays on a rotating basis.  (Doc. 14, Porter Dep., at 17; 29.)

Porter testified that she knew of the on-call responsibility when she was hired. (*Id.* at 14.)

Initially Porter worked full-time, but in early 2013, Porter went part-time, maintaining the same on-call responsibilities. (*Id.* at 12.) Then, during the summer of 2013, Porter was diagnosed with lupus. (*Id.* at 19.) In August, Porter requested consecutive FMLA leave through early November 2013. (*Id.* at 18-19; Doc. 14-1, Porter Ex. 3, at 10.) Porter also requested intermittent FMLA leave to accommodate any flare ups she might experience after her return. (*Id.* at 19-20; Doc. 14-1, Porter Ex. 4, at 14.) When Porter returned from her FMLA consecutive leave, she was assigned the same on-call responsibility she always had. However, the optional sonographer at the time, Lauren Poelking, was taking most (if not all) of the on-call hours for the regular sonographers, and so it appears that Porter did not have to accept the on-call responsibility hours at that time. (Doc. 14, Porter Dep., at 21.)

### C. Porter's Doctor Restricts Her Ability to Take Overnight On-Call Responsibility

In June 2014, Porter's doctor imposed a restriction that she could no longer take the on-call responsibility after 9:00 p.m. (*Id.* at 30; Doc. 14-2, Porter Ex. 7, at 2.) When Patten became aware of this restriction, she noted that it was a "huge deal in this department." (Doc. 13, Patten Dep., at 30; Doc. 13-1, Patten Ex. 2, at 2.) To ensure coverage for the hospital, Patten sent an

email to the sonographers, requesting volunteers to cover Porter's on-call responsibilities and noting that, if no one volunteered, she would assign Porter's on-call responsibilities on a rotating basis. (Doc. 14-2, Porter Ex. 8, at 5.) In late July, Porter's restrictions were clarified that she could not take on-call responsibility from 9:00 p.m. until 6:00 a.m. the following morning. (Doc. 14-3, Porter Ex. 11, at 1.) It appears that Patten did not receive any volunteers in response to her email, because in August, she assigned Porter's Tuesdays to the regular sonographers on a rotating basis. (Doc. 14, Porter Dep., at 36, 43; Doc. 14-3, Porter Exhs. 12, 13, at 2-3.)

At some point in September 2014, Porter volunteered to take all evening on-call responsibility until 9:00 p.m. (except for Mondays) and all weekend call after 6:00 a.m. and before 9:00 p.m. (*Id.* at 54; Doc. 14-4, Porter Exhs. 16, 17, 1-2.) This resulted in Porter having more on-call responsibility hours than any other sonographer. (Doc. 14, Porter Dep., at 56-57); (Doc. 13, Patten Dep., at 49.) Patten applauded Porter's willingness to volunteer and thanked the other sonographers for not complaining when picking up Porter's overnight on-call responsibility. (Doc. 14-2, Porter Ex. 17, at 2.)

Nonetheless, Defendant asserts that ensuring coverage for Porter's overnight on-call responsibilities was difficult. The record contains many emails from Patten to her team regarding the

on-call schedule and working to get all shifts covered. Patten testified that several sonographers complained about the fact that Porter did not have to work or at least be responsible for overnight on-call hours. (Doc. 13, Patten Dep., at 42-46.) Patten indicated that always making sure someone could cover the hours was stressful and difficult, and she had concerns about the long-term effect on employee morale. (*Id.* at 50-52; 71-72.)

Rachel Schill testified that she complained about Porter's inability to take overnight on-call responsibilities. (Doc. 18, Schill Dep., at 44, 45.) Patten indicated that both Rachel Schill and Jackie Bauer complained, (Doc. 13, Patten Dep., at 43), but Bauer's testimony suggests that, although she was not pleased with the situation and "vented" informally, she never formally complained to management. (Doc. 20, Bauer Dep., at 24-25.)

It appears that the sonographer staffing situation changed in October 2014. (Doc. 14, Porter Dep., at 53.) Lauren Poelking ("Poelking"), the optional sonographer who had been covering most of the on-call responsibilities, obtained employment at another facility. Because this was expected to limit Poelking's ability to take on-call responsibility at Good Samaritan, Patten notified the regular sonographers they would need to help cover Porter's overnight on-call responsibility. (Doc. 14-4, Porter Exhs. 16, 18, at 1, 3.) Patten also indicated that Defendant would be hiring another optional sonographer to cover Porter's overnight on-call

responsibility. (*See id.*) Defendant did, in fact, hire an optional sonographer, Laura Korblick ("Korblick"), who started in November 2014.[5] (Doc. 14, Porter Dep., at 57, 59; Doc. 14-4, Porter Ex. 19, at 4.) Korblick took Porter's on-call responsibility, as well as that of many of the other regular sonographers. (Doc. 14, Porter Dep., at 59.) Poelking also continued to pick up on-call shifts on an ad hoc basis.

### D. Porter's Overnight Restrictions Were Deemed Permanent

In July 2015, Porter's restrictions precluding her from taking the overnight on-call responsibility were deemed permanent. In August, a meeting was held between Porter, Patten, and Jackie Hill from Defendant's HR department.[6] (*Id.* at 69-70.) During this meeting, the ADA interactive process was explained to Porter, and Porter received a packet of information for her and her physician to complete. (*Id.* at 70.) Included was a job description describing Porter's daily tasks, which Patten created for Porter's

---

[5] There is some dispute in the testimony as to whether Korblick was hired to replace Poelking or to cover Porter's on-call responsibility. Because Poelking was covering Porter's on-call responsibilities (along with most everyone else's), it seems this is a distinction without a difference. (Doc. 13, Patten Dep. at 52-53; 81; 87.) Korblick did, in fact, cover Porter's on-call shifts once she started. (Doc. 17, Korblick Dep. at 11-12.)

[6] Porter alleges that Patten made a comment about Porter not being around much longer because of how much she had been calling in sick. Review of the deposition testimony, however, reflects only that Patten informed Bauer, who was in need of extra hours, that given Porter's inability to take the overnight on-call shifts, hours would continue to be available.

physician to consider. (Doc. 13, Patten Dep., at 67-68); (Doc. 12, Hill Dep., at 32-34.) The job description reflected the overnight on-call responsibility, even though the "generic" job description which applied to all sonographers at the hospital — not just those in the Radiology Department — did not mention the on-call responsibility. (Doc. 12, Hill Dep., at 32-33.) Ultimately, Porter requested an accommodation that she not be required to take on-call responsibility after 9:00 p.m. and before 6:00 a.m. (Doc. 13, Patten Dep., at 71; Doc. 14, Porter Dep., at 25.)

Patten completed a response to Porter's requested accommodation, in which she indicated that the overnight on-call responsibility was a mandatory and important job function that each sonographer in the department must be able to perform. (Doc. 13-2, Patten Ex. 14, at 10.) She described the importance of having sonographers available to perform emergency ultrasound services and noted that she could no longer accommodate Porter's inability to perform this job function because "[t]o impose this demand upon the other few sonographers will cause employee dissatisfaction, ultimately leading to loss of staff." (*Id.*) (*See also* Doc. 13, Patten Dep., at 88.)

Patten further indicated that, while she had hired Korblick to cover Porter's overnight on-call responsibility when she understood the accommodation to be temporary, this situation could

not continue because Korblick[7] was transferring to another hospital and would not be obligated to cover Porter's hours.[8]  (Doc. 13-2, Patten Ex. 14, at 10.)  Given the transient nature of the optional position, hiring another optional employee to cover Porter's overnight on-call responsibility was not feasible.  (*Id.*)

Patten admitted that once Porter requested this accommodation, Patten did not engage with Porter about alternatives, nor did she speak with any of the sonographers about keeping the modified schedule that had been in place or agreeing to take on Porter's on-call responsibilities permanently.  (Doc. 13, Patten Dep., at 16-17.)  At least one sonographer, Justice Daniels, testified that he would have accepted Porter's overnight on-call responsibilities permanently if asked.  (Doc. 19, Daniels Dep., at 29.)  According to Patten, she had been accommodating Porter's restrictions and had been trying to find a workable schedule for a year, but it simply was not possible.  (Doc. 13, Patten Dep., at 16-18.)

---

[7] Korblick was transferring to Bethesda Butler and was taken off the on-call responsibility rotation because it was expected that she would pick up on-call shifts at this new facility.  (Doc. 17, Korblick Dep., at 16-17.)  However, she did continue to pick up on-call responsibility on an ad hoc basis, as the on-call shift requirement at Bethesda Butler never materialized (until recently).  (*See id.* at 16-17, 30-32.)

[8] Patten further testified that, but for covering Porter's on-call shifts, the need for an optional sonographer had lessened, and so she did not need to hire someone to replace Korblick.  (Doc. 13, Patten Dep., at 81.)

When Human Resources received Patten's response, it inquired why the accommodation was no longer possible, as the modified schedule had been in place for a year. (Doc. 12, Hill Dep., at 17-19.) Once hearing Patten's rationale, HR did not further investigate. (*Id.* at 17-19; 45.)

Patten and her manager met with Porter and informed her that they could not accommodate her as requested. (Doc. 14, Porter Dep., at 74-75.) Patten offered that Porter could continue working for several weeks, but Porter decided that day would be her last day. (*Id.* at 75.) Porter's last day worked was August 27, 2015, at which time she was placed on administrative leave. (*Id.* at 77; Doc. 14-6, Porter Ex. 27, at 3.) She was given access to Defendant's database to search for other jobs. (Doc. 14-6, Porter Ex. 27, at 3.) She applied for several jobs and received two interviews. Jackie Hill called at least one of these hiring supervisors and asked her to consider Porter for the open position. (Doc. 21, Fender Dep., at 11.) Ultimately, Porter did not receive either position.[9] (Doc. 14, Porter Dep., at 78-80.) Porter filed a charge of discrimination with the EEOC on September 1, 2015. (Doc. 14-6, Porter Ex. 26, at 1.)

---

[9] Porter alleges that, in response to one potential supervisor's questions regarding Porter's performance, Patten responded that Porter had attendance issues, which Porter attributes to her claim that Patten had bias against Porter's FMLA use. However, review of the testimony shows that Patten's comments pertained to Porter's tardiness, not attendance.

**E.    Porter's Allegations of Unfair Treatment**

In her deposition, Porter identified several situations in which she felt Patten had treated her less favorably than Caucasian employees.

In January 2014, Porter applied for a position at the Evendale location.  (Doc. 14, Porter Dep., at 22.)  She asked Patten to put in a good word for her, and although Patten said she would, Porter later learned that Patten did not "push" for Porter to get the position because Patten felt there were things Porter needed to work on.  (*Id.* at 24.)  Porter claims that, instead, Patten pushed for an optional sonographer to get the job.  (*Id.*)  Patten explained that Porter did not have a vascular certification, which the Evendale supervisor wanted, but Patten offered to help Porter get into those positions by mentoring her on certain issues.  (Doc. 13, Patten Dep., at 97.)  Ultimately, neither candidate received that job.  (Doc. 14, Porter Dep., at 25.)  When asked directly whether Porter believed that Patten did not give her a good reference because of her race, Porter responded "I'm not sure." (*Id.* at 26.)

Porter describes another incident in July 2015.  Porter sent an email to Patten informing her that she could not cover Korblick's on-call responsibility on a Saturday from 4 p.m.- 6 p.m.  (*Id.* at 64; Doc. 14-5, Porter Ex. 24, at 6.)  Patten responded

that Porter needed to find other coverage because she was the one with the commitment to the hours. (Doc. 14, Porter Dep., at 64-65.) Porter felt this was unfair because the day was originally Korblick's, and so Korblick should have been required to find the alternate coverage, not Porter. (*Id.* at 65.) Notably, this was during the time when Porter had agreed to take all on-call responsibility until 9:00 p.m. (*Id.*) However, from Porter's perspective, she had volunteered to cover it and so it was not an actual commitment. (*Id.* at 65-66.)

Porter also testified generally that Patten treated her differently "because of [her] race." (*Id.* at 66.) Porter testified that she felt that way "[b]ecause she was giving Caucasian workers a different treatment, better treatment than the African-American workers." (*Id.* at 67.) Justice Daniels, who is African, testified as to several ways in which he felt he was treated differently and was subjected to a hostile work environment. (Doc. 19, Daniels Dep., at 29.) Porter testified that Patten favored Rachel Schill because she could do "basically anything" compared to Porter and Daniels. (Doc. 14, Porter Dep., at 68.) When asked to give examples, Porter responded "I don't recall all of them, but they – they are in some of these emails." (*Id.*) Porter also admitted she could not recall whether Patten ever made any negative or derogatory comments about her race, but she never complained to HR about Patten. (*Id.* at 48-49.)

Porter filed this lawsuit on October 4, 2016.  (Doc. 1).

*Analysis*

**A.   Porter's ADA Claim**

To be successful on her ADA claim, Porter must first prove
that (1) she is disabled, and (2) she is otherwise qualified for
the position despite her disability, with or without a reasonable
accommodation.   *See* 42 U.S.C. § 12112 (a); *Williams v. AT&T
Mobility Servs., LLC*, 847 F.3d 384, 391 (6th Cir. 2017).   An
"otherwise qualified" individual is one who can perform the
essential job functions "with or without a reasonable
accommodation."   42 U.S.C. § 12111(8); *Cooley v. E. Tenn. Human
Res. Agency, Inc.*, No. 17-5355, 2017 WL 6547387, at *3 (6th Cir.
Dec. 22, 2017).

The parties do not dispute that Porter was disabled.   The
crux of this claim is whether: (1) accepting the overnight on-call
responsibility was an essential job function; (2) Porter's
proposed accommodation was reasonable; and (3) Defendant engaged
in the interactive process.

> **1.   Accepting the overnight on-call responsibility is
> an essential function of the sonographer position.**

The parties dispute whether the overnight on-call
responsibility is an essential function of the sonographer
position.  "Essential functions" are those "fundamental job duties
of the employment position the individual with a disability holds

or desires." 29 C.F.R. § 1630.2(n)(1). The applicable ADA regulations instruct courts to consider the following nonexclusive factors:

> (i) The employer's judgment as to which functions are essential;
> (ii) Written job descriptions prepared before advertising or interviewing applicants for the job;
> (iii) The amount of time spent on the job performing the function;
> (iv) The consequences of not requiring the incumbent to perform the function;
> (v) The terms of a collective bargaining agreement;
> (vi) The work experience of past incumbents in the job; and/or
> (vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3).

Although not determinative, courts generally find the employer's judgment highly probative of the essential function inquiry. *See Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 201-02 (6th Cir. 2010). *See also Laurin v. Providence Hosp.*, 150 F.3d 52, 59 (1st Cir. 1998); *Meyer-Gad v. Centra Care Health Sys.*, No. 05-1086, 2006 WL 2987668, at *5 (D. Minn. Oct. 18, 2006).

Another District Court has examined whether overnight on-call responsibility in a hospital constitutes an essential job function, concluding that it does. *Meyer-Gad*, 2006 WL 2987668, at *1. There, the plaintiff was a hospital chaplain who was diagnosed with narcolepsy. *Id.* The hospital for whom she worked offered its patients and families twenty-four-hour access to chaplains.

*Id.* To fulfill this service, the hospital employed seven chaplains. *Id.* These chaplains worked day shifts but were also required to be "on-call" one day each week from 5:00 p.m. to 8:00 a.m. *Id.* Although this on-call requirement was not included in the written job description, plaintiff understood that this was part of her job when she accepted employment. *Id.*

After her diagnosis with narcolepsy, plaintiff asked to be scheduled for on-call duty only on nights before she had a day off, which allowed her to catch up on her sleep. *Id.* The hospital agreed, and this schedule continued for a year. *Id.* Thereafter, plaintiff was required to cover a couple of on-call shifts without the next day off due to hospital staffing issues. *Id.* at *2. Her doctor then restricted her from working past 9:00 p.m. *Id.* After unsuccessfully working to find a mutually agreeable accommodation, the hospital terminated plaintiff's employment. *Id.* Plaintiff then filed a disability discrimination lawsuit.

The District Court analyzed whether the plaintiff was qualified to perform her job and concluded that she was not, because being on-call overnight was an essential function of the job. *Id.* at *5-7. The Court first found that being on-call overnight was an essential function because "[t]he Hospital must have spiritual care and counseling available 24 hours every day, and it cannot do so unless its chaplains are available at night." *Id.* at *5. The Court recognized that the written job description

did not refer to overnight work, but it emphasized that plaintiff knew when she took the position that she would have to take her share of overnight shifts. *Id.* Finally, the Court noted that because each full-time chaplain had to be on-call for at least one fifteen-hour shift a week, a significant percentage of the overall time of the chaplains was devoted to this function. Therefore, the Court concluded that the overnight on-call responsibility was an essential function of the chaplain position, rendering the plaintiff unqualified. *Id. See also Azzam v. Baptist Healthcare Affiliates, Inc.*, 855 F. Supp. 2d 653, 662 (W.D. Ky. 2012) (concluding that a nurse who could not perform the on-call responsibilities associated with the position was not "otherwise qualified," because the on-call responsibilities were essential functions).

This Court reaches the same conclusion based on the undisputed facts in this record.

First, the employer deems the overnight on-call responsibility to be an essential function of the sonographer position in the Radiology Department. Patten testified unequivocally that the overnight on-call responsibility is an essential function of the sonographer position in the Radiology Department. (Doc. 13, Patten Dep., at 18.) The reason for this is clear and admitted by Porter: medical emergencies can arise at any time requiring a sonographer to assist in treatment. (Doc.

14, Porter Dep., at 5.) Although courts are not required to give blind deference to the employer's judgment, *see E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 765 (6th Cir. 2015) (*en banc*), the unique requirements of a hospital, including emergencies that can occur at any time, warrants deference to such staffing decisions. *See Laurin*, 150 F.3d at 60 (acknowledging that "[t]he 24-hour hospital unit setting thus affords a particularly compelling context in which to defer to rational staffing judgments by hospital employers based on the genuine necessities of the hospital business").

Further, it goes without saying that a sonographer must be at work — not at home — in order to perform ultrasound exams on patients. *See Williams v. AT&T Mobility Serv.*, 847 F.3d 384, 392-93 (6th Cir. 2017) (holding that regular attendance was essential job function for customer service representative who had to be physically present at work station in order to take customer calls); *Ford Motor Co.*, 782 F.3d at 762-63 (being physically present at work was essential job function for employee whose duties required face-to-face interactions which could not be performed off-site). *Cf. Hostettler v. The College of Wooster*, 895 F.3d 844, (6th Cir. 2018) (holding that jury question existed as to whether full-time schedule was essential function; plaintiff adduced evidence that she could do much of her work from home).

Thus, this factor weighs in favor of finding the responsibility to be an essential function.

The second consideration is the job description.  Although the "generic" job description for a sonographer did not include any reference to overnight on-call responsibilities, Jackie Hill explained that it was simply a generic description for all sonographers under the TriHealth umbrella.  (Doc. 12, Hill Dep., at 32-33.)  Although other departments at Good Samaritan utilized an outside service for overnight on-call responsibilities, (see Doc. 25-1, Porter Decl. at ¶ 11), the Radiology Department did not.  (Doc. 13, Patten Dep., at 13.)  So, Hill asked Patten to tailor the job description to a sonographer's job duties in the Radiology Department so that Porter's doctor could be aware of her actual job duties.  (Doc. 12, Hill Dep., at 32-33.)  Moreover, even though the generic job description did not include the overnight on-call responsibility, Porter admits that she knew about the overnight on-call responsibility when she was hired and accepted overnight on-call responsibilities before and even after her lupus diagnosis.  (Doc. 14, Porter Dep., at 14.)  Accordingly, this factor also weighs in favor of an essential function finding.

The next factor addresses how much time the sonographers actually spent performing the job function.  Because the function is the responsibility of being on-call, not actually being called in, the inquiry must be the length of the on-call responsibility as compared to a sonographer's other hours.  Here, the sonographers had overnight on-call responsibilities for a significant part of

their weekly hours. Porter worked twenty-four hours a week, and she was guaranteed at least one fourteen hour on-call shift each week (more depending on the weekend rotation). (Doc. 14, Porter Dep., at 17.) Thus, for Porter, this overnight on-call responsibility accounted for 37% of her total responsibility each week. Assuming a forty-hour work week, each sonographer's guaranteed on-call responsibility would equal 26% of the total responsibility for the week. This is not an insignificant percentage, especially when the weekend hours are considered.

Porter emphasizes that sonographers were not actually called in to the hospital that often. She also relies on the fact that some sonographers would pick up the on-call responsibility from other sonographers, meaning that certain sonographers would go long periods of time without being responsible for any on-call shifts. Porter contends that the overnight on-call responsibility cannot be an essential function when some employees would go months without performing it. (Doc. 25, Opp. Br., at 14-15.)

This argument misses the mark. What is critical is not the hours actually worked but the *responsibility* to be available if needed. The point is that someone *must* be responsible for responding to the hospital twenty-four-hours a day. (Doc. 13, Patten Dep., at 13, 18-19, 20); (Doc. 14, Porter Dep., at 15.) Whether the sonographer is actually called in is irrelevant, as is whether a sonographer gives up his or her hours. Even when a

sonographer volunteers to cover an on-call shift, should the volunteering sonographer not follow through, the original sonographer remains responsible for those hours. (Doc. 13, Patten Dep., at 40.) Porter admits as much. (Doc. 14, Porter Dep., at 65.) *See Phelps v. Optima Health, Inc.*, 251 F.3d 21, 26 (1st Cir. 2001) (noting that "[t]he fact that an employee might only be assigned to certain aspects of a multi-task job does not necessarily mean that those tasks to which she was not assigned are not essential").

The next factor, the consequences of not requiring the incumbent to perform the function, similarly weighs in favor of concluding that the overnight on-call function is an essential function. Excusing a sonographer from performing the overnight on-call responsibility is simply not an option, as the hospital must have twenty-four-hour access to sonographers in the Radiology Department. *See Laurin*, 150 F.3d at 59 (recognizing that "[m]edical needs and emergencies-many potentially life-threatening-do not mind the clock, let alone staff-nurse convenience" and concluding that working a rotating shift is an essential function of the job). And, excusing only Porter from such a responsibility is similarly unworkable. There are only a handful of sonographers employed in the Radiology Department, and this would increase their burden — as it did for the period the department temporarily accommodated Porter. *See* 16 C.F.R. §

1630.2(n)(2)(ii) (providing that "(ii) [t]he function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed").

While Porter insists that no one complained about her inability to work overnights or her modified schedule, that is not entirely accurate. Rachel Schill admitted to being displeased with Porter's inability to take overnight on-call responsibilities and complaining about it. (Doc. 18, Schill Dep., at 44, 45.). Jackie Bauer testified she would vent often about the on-call situation. (Doc. 20, Bauer Dep., at 24-25.) And, even if no one complained to management, it is undisputed that all of the sonographers hated being on-call. Thus, increasing the burden of an onerous job duty on only a few employees would certainly strain the department. Patten's testimony about the concern for employee morale is clear. (Doc. 13, Patten Dep., at 88.) And this concern is a legitimate consideration. *See Ford*, 782 F.3d at 758 ("Harris's poor performance and high absenteeism harmed those around her. When she missed work, her teammates had to pick up the slack, including by taking on the functions that Harris could not perform at home."); *Kallail v. Alliant Energy Corp. Servs., Inc.*, 691 F.3d 925, 931 (8th Cir. 2012) (recognizing that avoiding employee complaints and maintaining morale are "legitimate business reasons for a scheduling decision" when deferring to the

employer's decision not to change an employee's schedule to exclude rotating shifts).

If nothing else, the inability of one sonographer to accept the overnight on-call responsibility created more work for the department manager.  The record is replete with emails in which Patten was scrambling to cover Porter's on-call responsibility, either seeking volunteers or imposing it on others.  (Doc. 13, Patten Dep., at 50-52, 71-72.)  Thus, even if no one formally complained, the inability of someone to work overnight on-call required the department manager to impose the extra work on other employees.

Porter insists that *Meyer-Gad* is factually distinguishable because, unlike in this case, the employees there were not permitted to avoid working their on-call shifts nor did they go months without being on-call.  (Doc. 25, Opp. Br., at 15.)  This argument reads too much into that case.  It is not clear whether, in that case, employees were permitted to switch on-call shifts, and so that court did not address that fact in its analysis.  Instead, the crux of its holding that the on-call responsibility was an essential function was that the hospital had to offer twenty-four-hour services to patients and families.  *Meyer-Gad*, 2006 WL 2987668, at *5.  Whether the chaplains were permitted to switch on-call shifts is irrelevant to this ultimate conclusion.

Moreover, Porter's reliance on three other cases is misplaced. First, the facts of *Henningsen v. City of Blue Earth*, 184 F. Supp. 3d 710 (D. Minn. 2016), are materially different. The Court there concluded that a jury should decide the essential function question primarily because of the employer's inconsistency as to whether the job description (which did not include the on-call requirement) was or was not exhaustive. *Henningsen*, 184 F. Supp. 3d at 724. Specifically, the company argued the job description was not exhaustive but it submitted the job description to the plaintiff's doctor as an exhaustive list of the plaintiff's job duties. *Id.* Here, Defendant tailored Porter's job description so that her doctor would have an accurate and complete picture of plaintiff's actual job duties. (Doc. 12, Hill Dep., at 32-33.) There is no inconsistency in this record.

The case of *Mueller v. Rutland Mental Health Services, Inc.*, No. 1:05-cv-38, 2006 WL 2585101, at *1 (D. Vt. Aug. 17, 2006), is also distinguishable. In that case, the plaintiff was a psychiatrist, and one of his job duties included evening, weekend, and holiday on-call responsibilities. *Id.* The plaintiff had a heart attack, and as a result, his physician temporarily limited him from working on-call. *Id.* In analyzing whether being on-call was an essential job function, the court concluded that a question of fact existed. *Id.* at *4. However, the plaintiff had introduced evidence that the employer had completely exempted another

employee from working on-call. *Id.* Here, Defendant has never consented to a sonographer abdicating the overnight on-call responsibility entirely, and although it permitted the exchange of shifts, someone always remained responsible for the on-call shift.

Finally, *Davis v. Ozarks Electric Cooperative*, No. Civ. 05-5095, 2006 WL 931903, at *1 (W.D. Ark. April 10, 2006), is also distinguishable. The plaintiff there was a field service representative for an electric company who often worked on-call. *Id.* The evidence showed that the field service representatives were permitted to trade on-call time with anyone — even those from other departments — and the duties performed while on-call were very simple. *Id.* at *5. Thus, the court found that reasonable jurors could conclude the on-call function was not essential. *Id.* Here, of course, the sonographer's role is quite specialized and, although the sonographers could trade on-call responsibility amongst themselves, they could not go outside the department to find volunteers.

Thus, the Court concludes as a matter of law that the overnight on-call responsibility is an essential function of the sonographer position in the Radiology Department at Good Samaritan Hospital.

### 2. Plaintiff's requested accommodation was not reasonable.

Porter admits that she could not perform the overnight on-call responsibility, and so the question becomes whether a reasonable accommodation was available which would permit her to do this function.

Porter argues that a modified schedule is an example of a reasonable accommodation and Defendant's refusal to grant this accommodation was discriminatory. Porter's only requested accommodation was her proposed "modified schedule," *i.e.*, that she take the on-call responsibility from 6-9 p.m. and then after 6:00 a.m. But Porter's proposal is not merely a modified schedule: it shifts the burden of the overnight on-call responsibility to someone else. As such, it is per se unreasonable. *Bush v. Compass Grp. USA, Inc.*, 683 F. App'x 440, 449 (6th Cir. 2017) (noting that "[w]e have consistently held that a proposed accommodation requesting that an employer remove an 'essential function' from the position ... is *per se* unreasonable"). *See also Kallail*, 691 F.3d at 932 (recognizing that, while job restructuring can be a possible accommodation, an employer "need not reallocate or eliminate the essential functions of a job to accommodate a disabled employee" (quoting *Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 950 (8th Cir. 1999))).

An employer is simply not required to shift the essential function of a job to another employee. *Meade v. AT&T Corp.*, 657 F. App'x 391, 397 (6th Cir. 2016). Although Porter claims that her co-workers liked her modified schedule, which itself appears untrue, another employee's willingness to pick up these shifts can change at any time. If Porter cannot take the on-call responsibility, and the volunteering sonographer changes her mind or otherwise becomes unable to work the shift, then the hospital is left without coverage.

Nor is an employer required to hire an employee to do the essential functions of a job for another employee. *See Hargett v. Jefferson Cnty. Bd. of Educ.*, No. 17-5368, 2017 WL 5664922, at *4 (6th Cir. Oct. 27, 2017). Porter contends that Defendant could have hired agencies to cover the overnight on-call responsibilities, as other departments within the hospital did. But the business decisions supporting the use of agencies in those departments and not the Radiology Department is outside the province of this Court. *See Kallail*, 691 F.3d at 931 (concluding that the fact that another call center did not use rotating shifts did not mean that it was not an essential function for the call center at issue).

The fact that Defendant accommodated Porter for a year before her termination does not change this analysis. *See Laurin*, 150 F.3d at 61 (recognizing that "[a]n employer does not concede that

a job function is 'non-essential' simply by voluntarily assuming the limited burden associated with a temporary accommodation, nor thereby acknowledge that the burden associated with a permanent accommodation would not be unduly onerous."); *Phelps*, 251 F.3d at 26 (concluding that evidence that adjustments could be made so that an employee could avoid a particular task was simply evidence that the job could be restructured, not that the function was non-essential).

Therefore, Porter's only proposed reasonable accommodation is per se unreasonable because it shifts the essential function of her job to someone else.  Moreover, she never actually proposed the other accommodations identified in her brief, but even if she had, they are also unreasonable because an employer is not required to hire someone to perform the essential functions of an employee's job.  Therefore, Porter never proposed a reasonable accommodation, and her ADA claim fails.

### 3. Interactive Process

Porter also contends that Defendant failed to participate in the interactive process mandated by the ADA.  However, under Sixth Circuit law, "failure to engage in the interactive process is not an independent violation of the ADA." *Keith*, 793 F.3d at 929.  In fact, a defendant's failure to participate in the interactive process is "only actionable if a qualified employee establishes a prima facie showing that she proposed a reasonable accommodation."

*Vaughn v. Parkwest Med. Ctr.*, 716 F. App'x 428, 434 (6th Cir. 2017).

The employee has the burden to initiate the interactive process and does so by requesting an accommodation. *Id.* Once the request is made, the employer is obliged to make a good faith effort to determine the appropriate accommodation. *Id.* "An employer has sufficiently acted in good faith when it readily meets with the employee, discusses any reasonable accommodations, and suggests other possible positions for the plaintiff." *Jakubowski*, 627 F.3d at 203. But the employer is not required to suggest counter accommodations. *Id.*

Here, Defendant sufficiently engaged in the interactive process as mandated by the ADA, and even if it did not, its failure is not actionable because Porter never proposed a reasonable accommodation. Defendant satisfied its burden because it met with Porter, explained the ADA to her, considered her requested accommodation, and, after concluding it was not a reasonable accommodation, provided Porter access to a job portal which she could use to apply for other jobs. Although Defendant never met with Porter after her initial accommodation request, it did work with her to find another job by providing her access to the job portal and making calls to potential supervisors and requesting they consider Porter's resume. These actions satisfy Defendant's obligations under the ADA. *See Jakubowski*, 627 F.3d at 203.

Accordingly, Defendant did not fail to engage in the interactive process and, even if it did, such a violation is not actionable because Porter never proposed a reasonable accommodation.

**B.    Porter's FMLA Claim**

Under the FMLA, an employee is entitled to twelve weeks of leave for various reasons, including because of a serious health condition.  *See* 29 U.S.C. § 2612(a)(1)(D).  A plaintiff can pursue an FMLA claim under two theories:  an entitlement or interference theory, which prohibits an employer from interfering with an employee's use of FMLA leave, and a retaliation or discrimination theory, which prohibits an employer from retaliating against an employee for her use of leave.  29 U.S.C. § 2615(a)(1) and (2).  In this case, Porter alleges claims under both theories.

Under Sixth Circuit law, an employer does not violate the FMLA if it terminates an employee who will be unable to return to work at the end of the FMLA leave period, even if the termination occurs before the end of the period.[10]  *See Edgar v. JAC Prods.,*

---

[10] This rule can apply under either an interference or retaliation claim.  The Sixth Circuit explained (as relevant here):

(1) [I]n entitlement cases, [the employee's inability to return to work at the conclusion of the FMLA period] provide[s] a defense to liability, regardless of whether the medical evidence revealing the employee's inability to return to work is available before or after the termination decision; (2) in

*Inc.*, 443 F.3d 501, 507, 513-14 (6th Cir. 2006). The FMLA protects the right to restoration to work. But if an employee remains "unable to perform an essential function of the position . . . [she has] no right to restoration" to the position under the FMLA. *Verhoff v. Time Warner Cable, Inc.*, 299 F. App'x 488, 496 (6th Cir. 2008); 29 C.F.R. § 825.214(b) (providing that employees who remain "unable to perform an essential function of the position because of a physical or mental condition ... [have] no right to restoration to another position under the FMLA.").

Porter could not perform an essential function of the job. Thus, Defendant was not required to continue her employment, and her termination did not interfere with her FMLA use because she was not entitled to the leave. *Verhoff*, 299 F. App'x at 496; *Edgar*, 443 F.3d at 507. Similarly, Defendant's decision to terminate Porter's employment was not retaliatory, because it terminated her for being unable to perform an essential function of her job, not for her use of FMLA leave.

---

retaliation cases where the medical information known to the employer prior to the termination decision shows that the employee could not return within 12 weeks, [this] can be invoked by employers as a legitimate, nondiscriminatory reason for discharging the employee, i.e., to rebut the employee's prima facie case of discrimination; . . . .

*See Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 513-14 (6th Cir. 2006).

Porter's reliance on *Verhoff* is misplaced.  There, the Sixth Circuit concluded that working more than full-time could not be an essential part of one's job under the FMLA.  *Verhoff*, 299 F. App'x at 497.  Porter was not working full time, and so the issue here is not whether she was required to work too many hours, but rather whether she could accept the overnight on-call responsibility.  Accordingly, *Verhoff* is inapposite.

Furthermore, Porter's FMLA leave, although labelled intermittent leave, would actually have been a permanent schedule change, which is not required under the FMLA.  *See Wiseman v. Vanderbilt Univ.*, No. 3:04-0946, 2005 WL 3055661, at *9 (M.D. Tenn. Nov. 14, 2005) (recognizing that, although the FMLA permits a reduced schedule or intermittent leave, it does not provide for a permanent schedule change).

Porter misstates the record in attempting to avoid this conclusion.  She did not seek to invoke FMLA leave *only* in those instances (1) when she had an overnight on-call responsibility and (2) she had a flare-up and (3) she was actually called into the hospital.  Instead, she informed Defendant she could not *never* accept the overnight on-call responsibility.  This is a schedule change, which is not required under the FMLA.  *See Wiseman*, 2005 WL 3055661, at *9.

Therefore, Defendant is entitled to summary judgment on Porter's FMLA claims.

## C. Porter's Race Discrimination Claim

Porter's race discrimination claim is similarly flawed. To establish a prima facie, Porter must show that: (1) she was a member of a protected class, (2) suffered an adverse employment action, (3) was qualified for the position, and (4) that she was replaced by a person outside of her protected class. *Guy v. Spader Freight Servs.*, No. 17-3028, 2017 WL 6939377, at *3 (6th Cir. Oct. 18, 2017). If she satisfies this burden, Defendant must provide a legitimate, non-discriminatory reason for the adverse employment action, after which the burden shifts back to Porter to show that the proffered reason is pretext. *See id.* "If an employer has an honest belief in the nondiscriminatory basis upon which it has made its employment decision, then the employee will not be able to establish pretext." *Block v. Meharry Med. Coll.*, No. 17-5484, 2018 WL 501392, at *5 (6th Cir. Jan. 22, 2018) (internal quotations and citations omitted).

For the reasons discussed above, Porter was not qualified for her job, and so she cannot prove a prima facie case. She argues that she was discriminated against because Patten terminated her when she could not accept the overnight on-call responsibility but allowed Caucasian employees to give up their shifts and assisted them in finding coverage those shifts. This argument cherry-picks the facts and continues to ignore the crucial distinction: Porter could not be responsible for *any* on-call shifts. Moreover, Porter

has failed to establish any specific instances of discrimination based on race. She offers only vague allegations, which are insufficient to support a race discrimination claim.

Even if she could establish the prima facie case, Defendant has offered a legitimate, non-discriminatory reason for her termination: her inability to accept overnight on-call responsibility. Even if this were not an essential function, defendant honestly believed it to be, as shown through Patten's testimony, and so Porter cannot prove pretext. *Block*, 2018 WL 501392, at *5. Indeed, Porter does not even argue pretext in her brief.

Therefore, Defendant is entitled to summary judgment on this claim as well.

Therefore, having reviewed this matter, and the Court being advised,

**IT IS ORDERED** that defendant's motion for summary judgment (Doc. 15) be, and is hereby, **GRANTED**. A separate judgment shall enter concurrently herewith.

This 2nd day of November, 2018.



Signed By:
*William O. Bertelsman*
United States District Judge